Albert H. Kauffman, Mexican American Legal Defense and Educational Fund, San Antonio, David Hall, Texas Rural Legal Aid, Inc., Weslaco, Roger Rice, Camilo Perez, Peter Roos, Meta, Inc., Somerville, Mass., Richard E. Gray, III, Gray & Becker, David R. Richards, Richards, Wiseman & Durst, Austin, for petitioners.

Earl Luna, Robert E. Luna, Dallas, James W. Deatherage, Power, Deatherage, Tharp & Blankenship, Irving, Kevin T. O'Hanlon, Office of the Atty. Gen. of Texas, Jim Mattox, Atty. Gen., Timothy L. Hall, Hughes & Luce, Austin, Jerry Hoodenpyle, Rohne, Hoodenpyle, Lobert & Myers, Arlington, for respondents.

**EDGEWOOD INDEPENDENT SCHOOL DISTRICT et al., Petitioners,**

v.

**William KIRBY et al., Respondents.**

No. C–8353.

Supreme Court of Texas.

Oct. 2, 1989.

Rehearing Denied Oct. 2, 1989.

## OPINION

MAUZY, Justice.

At issue is the constitutionality of the Texas system for financing the education of public school children. Edgewood Inde-

pendent School District, sixty-seven other school districts, and numerous individual school children and parents filed suit seeking a declaration that the Texas school financing system violates the Texas Constitution. The trial court rendered judgment to that effect and declared that the system violates the Texas Constitution, article I, section 3, article I, section 19, and article VII, section 1. By a 2–1 vote, the court of appeals reversed that judgment and declared the system constitutional. 761 S.W.2d 859 (1988). We reverse the judgment of the court of appeals and, with modification, affirm that of the trial court.

The basic facts of this cause are not in dispute.[1] The only question is whether those facts describe a public school financing system that meets the requirements of the Constitution. As summarized and excerpted, the facts are as follows.

There are approximately three million public school children in Texas. The legislature finances the education of these children through a combination of revenues supplied by the state itself and revenues supplied by local school districts which are governmental subdivisions of the state. Of total education costs, the state provides about forty-two percent, school districts provide about fifty percent, and the remainder comes from various other sources including federal funds. School districts derive revenues from local ad valorem property taxes, and the state raises funds from a variety of sources including the sales tax and various severance and excise taxes.

There are glaring disparities in the abilities of the various school districts to raise revenues from property taxes because taxable property wealth varies greatly from district to district. The wealthiest district has over $14,000,000 of property wealth per student, while the poorest has approximately $20,000; this disparity reflects a 700 to 1 ratio. The 300,000 students in the lowest-wealth schools have less than 3% of the state's property wealth to support their education while the 300,000 students in the

highest-wealth schools have over 25% of the state's property wealth; thus the 300,000 students in the wealthiest districts have more than eight times the property value to support their education as the 300,000 students in the poorest districts. The average property wealth in the 100 wealthiest districts is more than twenty times greater than the average property wealth in the 100 poorest districts. Edgewood I.S.D. has $38,854 in property wealth per student; Alamo Heights I.S.D., in the same county, has $570,109 in property wealth per student.

The state has tried for many years to lessen the disparities through various efforts to supplement the poorer districts. Through the Foundation School Program, the state currently attempts to ensure that each district has sufficient funds to provide its students with at least a basic education. See Tex.Educ.Code § 16.002. Under this program, state aid is distributed to the various districts according to a complex formula such that property-poor districts receive more state aid than do property-rich districts. However, the Foundation School Program does not cover even the cost of meeting the state-mandated minimum requirements. Most importantly, there are no Foundation School Program allotments for school facilities or for debt service. The basic allotment and the transportation allotment understate actual costs, and the career ladder salary supplement for teachers is underfunded. For these reasons and more, almost all school districts spend additional local funds. Low-wealth districts use a significantly greater proportion of their local funds to pay the debt service on construction bonds while high-wealth districts are able to use their funds to pay for a wide array of enrichment programs.

Because of the disparities in district property wealth, spending per student varies widely, ranging from $2,112 to $19,333. Under the existing system, an average of $2,000 more per year is spent on each of the 150,000 students in the wealthiest dis-

1. By agreement of the parties, the 1985–86 school year was used as the test year for purposes of constitutional review.

tricts than is spent on the 150,000 students in the poorest districts.

The lower expenditures in the property-poor districts are not the result of lack of tax effort. Generally, the property-rich districts can tax low and spend high while the property-poor districts must tax high merely to spend low. In 1985–86, local tax rates ranged from $.09 to $1.55 per $100 valuation. The 100 poorest districts had an average tax rate of 74.5 cents and spent an average of $2,978 per student. The 100 wealthiest districts had an average tax rate of 47 cents and spent an average of $7,233 per student. In Dallas County, Highland Park I.S.D. taxed at 35.16 cents and spent $4,836 per student while Wilmer–Hutchins I.S.D. taxed at $1.05 and spent $3,513 per student. In Harris County, Deer Park I.S.D. taxed at 64.37 cents and spent $4,846 per student while its neighbor North Forest I.S.D. taxed at $1.05 and yet spent only $3,182 per student. A person owning an $80,000 home with no homestead exemption would pay $1,206 in taxes in the east Texas low-wealth district of Leveretts Chapel, but would pay only $59 in the west Texas high-wealth district of Iraan–Sheffield. Many districts have become tax havens. The existing funding system permits "budget balanced districts" which, at minimal tax rates, can still spend above the statewide average; if forced to tax at just average tax rates, these districts would generate additional revenues of more than $200,000,000 annually for public education.

Property-poor districts are trapped in a cycle of poverty from which there is no opportunity to free themselves. Because of their inadequate tax base, they must tax at significantly higher rates in order to meet minimum requirements for accreditation; yet their educational programs are typically inferior. The location of new industry and development is strongly influenced by tax rates and the quality of local schools. Thus, the property-poor districts with their high tax rates and inferior schools are unable to attract new industry or development and so have little opportunity to improve their tax base.

The amount of money spent on a student's education has a real and meaningful impact on the educational opportunity offered that student. High-wealth districts are able to provide for their students broader educational experiences including more extensive curricula, more up-to-date technological equipment, better libraries and library personnel, teacher aides, counseling services, lower student-teacher ratios, better facilities, parental involvement programs, and drop-out prevention programs. They are also better able to attract and retain experienced teachers and administrators.

The differences in the quality of educational programs offered are dramatic. For example, San Elizario I.S.D. offers no foreign language, no pre-kindergarten program, no chemistry, no physics, no calculus, and no college preparatory or honors program. It also offers virtually no extracurricular activities such as band, debate, or football. At the time of trial, one-third of Texas school districts did not even meet the state-mandated standards for maximum class size. The great majority of these are low-wealth districts. In many instances, wealthy and poor districts are found contiguous to one another within the same county.

Based on these facts, the trial court concluded that the school financing system violates the Texas Constitution's equal rights guarantee of article I, section 3, the due course of law guarantee of article I, section 19, and the "efficiency" mandate of article VII, section 1. The court of appeals reversed. We reverse the judgment of the court of appeals and, with modification, affirm the judgment of the trial court.

Article VII, section 1 of the Texas Constitution provides:

A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools.

The court of appeals declined to address petitioners' challenge under this provision

and concluded instead that its interpretation was a "political question." Said the court:

> That provision does, of course, require that the school system be "efficient," but the provision provides no guidance as to how this or any other court may arrive at a determination of what is efficient or inefficient. Given the enormous complexity of a school system educating three million children, this Court concludes that which is, or is not, "efficient" is essentially a political question not suitable for judicial review.

761 S.W.2d at 867. We disagree. This is not an area in which the Constitution vests exclusive discretion in the legislature; rather the language of article VII, section 1 imposes on the legislature an affirmative duty to establish and provide for the public free schools. This duty is not committed unconditionally to the legislature's discretion, but instead is accompanied by standards. By express constitutional mandate, the legislature must make "suitable" provision for an "efficient" system for the "essential" purpose of a "general diffusion of knowledge." While these are admittedly not precise terms, they do provide a standard by which this court must, when called upon to do so, measure the constitutionality of the legislature's actions. *See Williams v. Taylor*, 83 Tex. 667, 19 S.W. 156 (1892). We do not undertake this responsibility lightly and we begin with a presumption of constitutionality. *See Texas Public Bldg. Authority v. Mattox*, 686 S.W.2d 924, 927 (Tex.1985). Nevertheless, what this court said in only its second term, when first summoned to strike down an act of the Republic of Texas Congress, is still true:

> [W]e have not been unmindful of the magnitude of the principles involved, and the respect due to the popular branch of the government.... Fortunately, however, for the people, the function of the judiciary in deciding constitutional questions is not one which it is at liberty to decline.... [We] cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution; [we] cannot pass it by because it is doubtful; with whatever doubt, with whatever difficulties a case may be attended, [we] must decide it, when it arises in judgment.

*Morton v. Gordon*, Dallam 396, 397–398 (Tex.1841). If the system is not "efficient" or not "suitable," the legislature has not discharged its constitutional duty and it is *our* duty to say so.

The Texas Constitution derives its force from the people of Texas. This is the fundamental law under which the people of this state have consented to be governed. In construing the language of article VII, section 1, we consider "the intent of the people who adopted it." *Director of Dep't of Agriculture and Env't v. Printing Indus. Ass'n*, 600 S.W.2d 264, 267 (Tex.1980); *see also Smissen v. State*, 71 Tex. 222, 9 S.W. 112, 116 (1888). In determining that intent, "the history of the times out of which it grew and to which it may be rationally supposed to have direct relationship, the evils intended to be remedied and the good to be accomplished, are proper subjects of inquiry." *Markowsky v. Newman*, 134 Tex. 440, 136 S.W.2d 808, 813 (1940). However, because of the difficulties inherent in determining the intent of voters over a century ago, we rely heavily on the literal text. We seek its meaning with the understanding that the Constitution was ratified to function as an organic document to govern society and institutions as they evolve through time. *See generally Printing Indus.*, 600 S.W.2d at 268–269.

The State argues that, as used in article VII, section 1, the word "efficient" was intended to suggest a simple and inexpensive system. Under the Reconstruction Constitution of 1869, the people had been subjected to a militaristic school system with the state exercising absolute authority over the training of children. *See* Tex. Const. art. VII, § 1, interp. commentary (Vernon 1955). Thus, the State contends that delegates to the 1875 Constitutional Convention deliberately inserted into this provision the word "efficient" in order to prevent the establishment of another Reconstruction-style, highly centralized school system.

While there is some evidence that many delegates wanted an economical school system, there is no persuasive evidence that the delegates used the term "efficient" to achieve that end. *See Journal of the Constitutional Convention of the State of Texas* 136 (Oct. 8, 1875); S. McKay, *Debates in the Texas Consitutional Convention of 1875* 107, 217, 350–351 (1930). It must be recognized that the Constitution requires an "efficient," not an "economical," "inexpensive," or "cheap" system. The language of the Constitution must be presumed to have been carefully selected. *Leander Indep. School Dist. v. Cedar Park Water Supply Corp.*, 479 S.W.2d 908 (Tex.1972); *Cramer v. Sheppard*, 140 Tex. 271, 167 S.W.2d 147 (Tex.1943). The framers used the term "economical" elsewhere [2] and could have done so here had they so intended.

There is no reason to think that "efficient" meant anything different in 1875 from what it now means. "Efficient" conveys the meaning of effective or productive of results and connotes the use of resources so as to produce results with little waste; this meaning does not appear to have changed over time.[3] *E.g.,* IV *Oxford English Dictionary* 52 (1971); *Webster's Third New International Dictionary* 725 (1976). One dictionary used by the framers defined efficient as follows:

> Causing effects; producing results; actively operative; not inactive, slack or incapable; characterized by energetic and useful activity....

*N. Webster, An American Dictionary of the English Language* 430 (1864). In 1890, this court described "efficient" machinery as being "such as is capable of well producing the effect intended to be secured by the use of it for the purpose for which it was made." *Maxwell v. Bastrop Mfg. Co.*, 77 Tex. 233, 14 S.W. 35, 36 (1890).

Considering "the general spirit of the times and the prevailing sentiments of the people," it is apparent from the historical record that those who drafted and ratified article VII, section 1 never contemplated the possibility that such gross inequalities could exist within an "efficient" system.[4] *See Mumme v. Marrs*, 120 Tex. 383, 40 S.W.2d 31, 35 (1931). At the Constitutional Convention of 1875, delegates spoke at length on the importance of education for *all* the people of this state, rich and poor alike. The chair of the education committee, speaking on behalf of the majority of the committee, declared:

> [Education] must be classed among the abstract rights, based on apparent natural justice, which we individually concede to the State, for the general welfare, when we enter into a great compact as a commonwealth. I boldly assert that it is for the general welfare of all, rich and poor, male and female, that the means of a common school education should, if possible, be placed within the reach of every child in the State.

S. McKay, *Debates in the Texas Constitutional Convention of 1875* 198 (1930). Other delegates recognized the importance of a diffusion of knowledge among the masses not only for the preservation of democracy, but for the prevention of crime

---

2. "The legislature shall not have the right to levy taxes or impose burdens upon the people, except to raise revenue sufficient for the economical administration of the government ..." Tex. Const. art. III, § 48 (1876, repealed 1969).

3. This usage is seen in text as well. *E.g.,* H. Fawcett, *Manual of Political Economics* 193 (1863) ("That nothing more powerfully promotes the efficiency of labour than an abundance of fertile land."); G.D. Argyll, *The Reign of Law* 321 (1871) ("This change in mind is the efficient cause of a whole cycle of other changes."); H.B. Stowe, *Uncle Tom's Cabin* 297 (1850) ("He was an expert and efficient workman.").

4. Delegate Henry Cline, who first proposed the term "efficient," urged the convention to ensure that sufficient funds would be provided to those districts most in need. S. McKay, *Debates in the Constitutional Convention of 1875* 217 (1930). He noted that those with some wealth were already making extravagant provisions for the schooling of their own children and described a public school system in which those funds that had selfishly been used by the wealthy would be made available for the education of all the children of the state. *Id.* at 217–18.

and for the growth of the economy. *See, e.g., id.* at 199–200, 216–217, 335.

In addition to specific comments in the constitutional debates, the structure of school finance at the time indicates that such gross disparities were not contemplated. Apart from cities, there was no district structure for schools nor any authority to tax locally for school purposes under the Constitution of 1876. B. Walker and W. Kirby, *The Basics of Texas Public School Finance* 5, 86 (1986). The 1876 Constitution provided a structure whereby the burdens of school taxation fell equally and uniformly [5] across the state, and each student in the state was entitled to exactly the same distribution of funds. *See* Tex. Const. art. VII, § 5 (1876). The state's school fund was initially apportioned strictly on a per capita basis. B. Walker and W. Kirby at 21. Also, a poll tax of one dollar per voter was levied across the state for school purposes. *Id.* These per capita methods of taxation and of revenue distribution seem simplistic compared to today's system; however they do indicate that the people were contemplating that the tax burden would be shared uniformly and that the state's resources would be distributed on an even, equitable basis.

If our state's population had grown at the same rate in each district and if the taxable wealth in each district had also grown at the same rate, efficiency could probably have been maintained within the structure of the present system. That did not happen. Wealth, in its many forms, has not appeared with geographic symmetry. The economic development of the state has not been uniform. Some cities have grown dramatically, while their sister communities have remained static or have shrunk. Formulas that once fit have been knocked askew. Although local conditions vary, the constitutionally imposed state responsibility for an efficient education sys-

tem is the same for all citizens regardless of where they live.

We conclude that, in mandating "efficiency," the constitutional framers and ratifiers did not intend a system with such vast disparities as now exist. Instead, they stated clearly that the purpose of an efficient system was to provide for a *"general diffusion of knowledge."* (Emphasis added.) The present system, by contrast, provides not for a diffusion that is general, but for one that is limited and unbalanced. The resultant inequalities are thus directly contrary to the constitutional vision of efficiency.

The State argues that the 1883 constitutional amendment of article VII, section 3 expressly authorizes the present financing system. However, we conclude that this provision was intended *not* to preclude an efficient system but to serve as a a vehicle for injecting more money into an efficient system. James E. Hill, a legislator and supporter of the 1883 amendment, argued:

> If [article VII, section 1] means anything, and is to be enforced, then additional power must be granted to obtain the means "to support and maintain" an efficient system of public free schools. What is such a system, then? is the question. I have examined the laws of the older States of this Union, especially those noted for efficient free schools, and not one is supported alone by State aid, but that aid is supplemented always by local taxation.... When a man tells me he favors an efficient system of free schools, but is opposed to local taxation by districts or communities to supplement State aid, he shows that he ignores the successful systems of other States, or he is misleading in what he says.

Galveston Daily News, August 10, 1883, at 3, col. 9 (interview with Hon. James E. Hill). Governor O.M. Roberts also gave strong support to the 1883 amendment. In his address to the 18th Legislature, Gover-

---

5. Article VIII, section 1's requirement of "equal and uniform" taxation was also the subject of much debate at the Constitutional Convention of 1875. There were clearly strong feelings against exemptions from taxation and special privileges. *See generally* 2 G. Braden, *The Con-* *stitution of the State of Texas: An Annotated and Comparative Analysis* 564–565 (1977). The framers opposed any schemes that would allow any classes of people to avoid an equal burden of taxation. *See* S. McKay at 296, 303, 306.

nor Roberts directed the legislature's attention to the efficiency standard set by article VII, section 1 and said: "The standard fixed in law is certainly high enough to enable the masses of people generally, who receive the benefit of it, to have that general diffusion of knowledge...." Speech of Gov. O.M. Roberts, S.J. of Tex., 18th Leg., Reg. Sess. 15 (1883). He then explained the need for the amendment by stating that the practical remedy for the attainment of the objective of efficiency was the formation of school districts with the power of taxation. Thus, article VII, section 3 was an effort to make schools more efficient and cannot be used as an excuse to avoid efficiency. *See also* 761 S.W.2d at 874 (further discussing the historical context of the amendment).

In the context of article VII, section 1, the legislature has expressed its understanding of the term "efficient" for a long time even though it has never given the term full effect. Sixty years ago, the legislature enacted the Rural Aid Appropriations Act with the express purpose of "equalizing the educational opportunities afforded by the State...." 1929 Tex. Gen. Laws, ch. 14 at 252 (3rd called session). Again, in creating the Gilmer–Aikin Committee to study school finance, the legislature indicated an awareness of this obligation when it spoke of "the foresight and evident intention of the founders of our State and the framers of our State Constitution to provide equal educational advantages for all." Tex.H.Con.Res. 48, 50th Leg. (1948). Moreover, section 16.001 of the legislatively enacted Education Code expresses the state's policy that "a thorough and efficient system be provided ... so that each student ... shall have access to programs and services ... that are substantially equal to those available to any similar student, notwithstanding varying economic factors." Not only the legislature, but also this court has previously recognized the implicit link that the Texas Constitution establishes between efficiency and equality. In *Mumme v. Marrs*, 40 S.W.2d at 37, we stated that rural aid appropriations "have a real relationship to the subject of equalizing educational opportuni-

ties in the state, and tend to make our system more efficient...."

By statutory directives, the legislature has attempted through the years to reduce disparities and improve the system. There have been good faith efforts on the part of many public officials, and some progress has been made. However, as the undisputed facts of this case make painfully clear, the reality is that the constitutional mandate has not been met.

The legislature's recent efforts have focused primarily on increasing the state's contributions. More money allocated under the present system would reduce some of the existing disparities between districts but would at best only postpone the reform that is necessary to make the system efficient. A band-aid will not suffice; the system itself must be changed.

We hold that the state's school financing system is neither financially efficient nor efficient in the sense of providing for a "general diffusion of knowledge" statewide, and therefore that it violates article VII, section 1 of the Texas Constitution. Efficiency does not require a per capita distribution, but it also does not allow concentrations of resources in property-rich school districts that are taxing low when property-poor districts that are taxing high cannot generate sufficient revenues to meet even minimum standards. There must be a direct and close correlation between a district's tax effort and the educational resources available to it; in other words, districts must have substantially equal access to similar revenues per pupil at similar levels of tax effort. Children who live in poor districts and children who live in rich districts must be afforded a substantially equal opportunity to have access to educational funds. Certainly, this much is required if the state is to educate its populace efficiently and provide for a general diffusion of knowledge statewide.

Under article VII, section 1, the obligation is the legislature's to provide for an efficient system. In setting appropriations, the legislature must establish priorities according to constitutional mandate; equalizing educational opportunity cannot

be relegated to an "if funds are left over" basis. We recognize that there are and always will be strong public interests competing for available state funds. However, the legislature's responsibility to support public education is different because it is constitutionally imposed. Whether the legislature acts directly or enlists local government to help meet its obligation, the end product must still be what the constitution commands—i.e. an efficient system of public free schools throughout the state. *See Lee v. Leonard Indep. School Dist.*, 24 S.W.2d 449, 450 (Tex.Civ.App.—Texarkana 1930, writ ref'd). This does not mean that the state may not recognize differences in area costs or in costs associated with providing an equalized educational opportunity to atypical students or disadvantaged students. Nor does it mean that local communities would be precluded from supplementing an efficient system established by the legislature; however any local enrichment must derive solely from local tax effort.

Some have argued that reform in school finance will eliminate local control, but this argument has no merit. An efficient system does not preclude the ability of communities to exercise local control over the education of their children. It requires only that the funds available for education be distributed equitably and evenly. An efficient system will actually allow for more local control, not less. It will provide property-poor districts with economic alternatives that are not now available to them. Only if alternatives are indeed available can a community exercise the control of making choices.

Our decision today is not without precedent. Courts in nine other states with similar school financing systems have ruled those systems to be unconstitutional for varying reasons.[6] *DuPree v. Alma School Dist. No. 30*, 279 Ark. 340, 651 S.W.2d 90 (1983); *Serrano v. Priest*, 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971); *Horton v. Meskill*, 172 Conn. 615, 376 A.2d 359 (Conn.1977); *Rose v. Council for Better Educ.*, No. 88–SC–804–TG, —— S.W.2d —— (Ky. June 8, 1989) (Westlaw); *Helena Elementary School Dist. No. 1 v. State*, 769 P.2d 684 (Mont.1989); *Robinson v. Cahill*, 62 N.J. 473, 303 A.2d 273, *cert. denied*, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973); *Seattle School Dist. No. 1 v. State*, 90 Wash.2d 476, 585 P.2d 71 (1978); *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979); *Washakie County School Dist. No. 1 v. Herschler*, 606 P.2d 310 (Wyo.), *cert. denied*, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980).[7]

Because we have decided that the school financing system violates the Texas Constitution's "efficiency" provision, we need not consider petitioners' other constitutional arguments. The Texas school financing system as set forth in the Texas Education Code, sections 16.001, *et seq.*, and as implemented in conjunction with local school districts containing unequal taxable property wealth, is unconstitutional under article VII, section 1 of the Texas Constitution.

Petitioners are entitled to recover against the state their attorney fees as found by the trial court. Tex.Civ.Prac. & Rem.Code §§ 104.001–104.002; *Texas State Employees Union v. Texas Dep't of Mental Health and Mental Retardation*, 746 S.W.2d 203 (Tex.1987); *see also Camarena v. Texas Employment Comm'n*, 754 S.W.2d 149 (Tex.1988). However, the trial

---

**6.** *But see Shofstall v. Hollins*, 110 Ariz. 88, 515 P.2d 590 (1973); *Lujan v. Colorado State Bd. of Educ.*, 649 P.2d 1005 (Colo.1982); *McDaniel v. Thomas*, 248 Ga. 632, 285 S.E.2d 156 (1981); *Thompson v. Engelking*, 96 Idaho 793, 537 P.2d 635 (1975); *Hornbeck v. Somerset County Bd. of Educ.*, 295 Md. 597, 458 A.2d 758 (1983); *Board of Educ., Levittown v. Nyquist*, 57 N.Y.2d 27, 453 N.Y.S.2d 643, 439 N.E.2d 359 (1982), *appeal dism'd*, 459 U.S. 1138, 103 S.Ct. 775, 74 L.Ed.2d 986 (1983); *Board of Educ. v. Walter*, 58 Ohio St.2d 368, 390 N.E.2d 813 (1979), *cert. denied*, 444 U.S. 1015, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980); *Fair School Finance Council of Oklahoma, Inc. v. Oklahoma*, 746 P.2d 1135 (Okla.

1987); *Olsen v. State*, 276 Or. 9, 554 P.2d 139 (1976); *Danson v. Casey*, 484 Pa. 415, 399 A.2d 360 (1979); *Richland County v. Campbell*, 294 S.C. 346, 364 S.E.2d 470 (1988).

**7.** The Supreme Court of Michigan has also considered the question and initially held that its system was unconstitutional; however, on rehearing the court vacated its opinion and held that it had improvidently granted the certified question. *Milliken v. Green*, 389 Mich. 1, 203 N.W.2d 457 (1972), *on rehearing*, 390 Mich. 389, 212 N.W.2d 711 (1973).

court did not abuse its discretion in refusing to award attorney fees against the defendant school districts. *See Oake v. Collin County*, 692 S.W.2d 454 (Tex.1985).

Although we have ruled the school financing system to be unconstitutional, we do not now instruct the legislature as to the specifics of the legislation it should enact; nor do we order it to raise taxes. The legislature has primary responsibility to decide how best to achieve an efficient system. We decide only the nature of the constitutional mandate and whether that mandate has been met. Because we hold that the mandate of efficiency has not been met, we reverse the judgment of the court of appeals. The legislature is duty-bound to provide for an efficient system of education, and only if the legislature fulfills that duty can we launch this great state into a strong economic future with educational opportunity for all.

Because of the enormity of the task now facing the legislature and because we want to avoid any sudden disruption in the educational processes, we modify the trial court's judgment so as to stay the effect of its injunction until May 1, 1990.[8] However, let there be no misunderstanding. A remedy is long overdue. The legislature must take immediate action. We reverse the judgment of the court of appeals and affirm the trial court's judgment as modified.

---

8. We note that the Governor has already called a special session of the legislature to begin No- vember 14, 1989; the school finance problem could be resolved in that session.