

# Office of the Attorney General
## State of Texas

**DAN MORALES**
ATTORNEY GENERAL

August 13, 1992

Honorable John Sharp
Comptroller of Public Accounts
LBJ State Office Building
Austin, Texas 78774

Opinion No. DM-155

Re: Whether a county education district must comply with the "truth-in-taxation" provisions in chapter 26 of the Tax Code by calculating effective and rollback tax rates, publishing notices of hearings, holding hearings, and if it receives a valid petition, calling a rollback election before adopting its tax rate, and related questions (RQ-384)

Dear Comptroller Sharp:

You have requested an opinion regarding the applicability of the truth-in-taxation provisions of the Tax Code to county education districts (CEDs). Although the Texas Supreme Court has declared the CEDs unconstitutional, it stayed the effect of its ruling until June 1, 1993. *See Carrollton-Farmers Branch Independent School District v. Edgewood Independent School District*, 826 S.W.2d 489, 522 (Tex. 1992) (hereafter *Edgewood IV*). This stay permits the CEDs to levy and collect taxes for the 1991-1992 and 1992-1993 school years, *see id.*, and makes the applicability of the truth-in-taxation provisions a relevant concern.

The truth-in-taxation provisions have two purposes: to educate taxpayers about tax-rate proposals and, under certain circumstances, to allow taxpayers to limit tax increases. STATE PROPERTY TAX BOARD, TRUTH IN TAXATION 1991: A GUIDE FOR SETTING TAX RATES, at 1 (1991). The provisions require a taxing unit[1] to calculate and publish its effective and rollback tax rates each year before adopting its actual tax rate. Tax Code § 26.04(e). Before adopting a tax rate that

---

[1]A "taxing unit" is any political subdivision of the state that is authorized to impose and is imposing property taxes. Tax Code § 1.04(12). The truth-in-taxation provisions apply to entities that are taxing units. *See, e.g., id.* § 26.04.

exceeds either the effective tax rate[2] plus three percent or the rollback rate,[3] a taxing unit must also publish notices and hold a public hearing. *Id.* §§ 26.05(d), 26.06. In addition, if a taxing unit adopts a rate that exceeds the rollback rate, the taxpayers may, by submitting a valid petition, demand that the taxing unit hold an election to determine whether the tax rate should be limited to the rollback rate. For taxing units other than school districts, a successful rollback election limits the tax increase for the current year. *Id.* § 26.07(e). For school districts, however, a successful rollback election limits the tax increase for the following year. *Id.* § 26.08(e).

The CEDs were created in 1991 by Senate Bill 351, as amended by House Bill 2885.[4] Nothing in either bill or in its legislative history clearly indicates whether the truth-in-taxation provisions apply to CEDs. However, the legislature's failure to indicate that the truth-in-taxation provisions are inapplicable to CEDs permits the inference that they do apply. Section 1.02 of the Tax Code states that the Property Tax Code,[5] which includes the truth-in-taxation provisions, applies to all taxing units

---

[2]The effective tax rate is the tax rate a taxing unit would need to adopt to raise the same revenue as it raised the previous year given the current value of the property taxed in the previous year. *See* STATE PROPERTY TAX BOARD, *supra*, at 4. The formula for calculating the effective tax rate in dollars per $100 of taxable value is as follows:

$$\frac{(\text{Last Year's Levy} - \text{Lost Property Levy})}{(\text{Current Total Value} - \text{New Property Value})} = \text{Effective Tax Rate}$$

Tax Code § 26.04(c)(1).

[3]Unlike the effective tax rate, the rollback tax rate distinguishes between the maintenance and operations tax rate and debt-service tax rate. This distinction allows a taxing unit to increase its debt-service tax rate to whatever rate is necessary to pay the interest and principal on bonds without triggering a rollback election, while it limits the increase in the maintenance and operations rate to eight cents for school districts and eight percent for all other taxing units. *See* STATE PROPERTY TAX BOARD, *supra*, at 5; Tax Code §§ 26.04(c)(2), 26.08(a). Because the rollback tax rate allows unlimited increases in the debt-service tax rate, the rollback tax rate will exceed the effective tax rate, unless the taxing unit experiences a decrease in its bonded indebtedness. STATE PROPERTY TAX BOARD, *supra*. According to the Property Tax Division of the Comptroller's Office, however, the CEDs levy only maintenance and operations taxes because they have no bonded indebtedness. Therefore, a CED's effective tax rate differs little from its rollback tax rate.

[4]Acts 1991, 72d Leg., ch. 20, at 381, amended by Acts 1991, 72d Leg., ch. 391, at 1475. In the rest of this opinion, we will refer to Senate Bill 351 as amended by House Bill 2885 as Senate Bill 351.

[5]The Property Tax Code is title one of the Tax Code. *See* Tax Code § 1.01.

unless the law creating the taxing unit expressly provides otherwise. In the past, the legislature has expressly provided otherwise. *See, e.g.*, Acts 1985, 69th Leg., 1st C.S., ch. 1, § 2(a), at 3788 (expressly making the truth-in-taxation provisions inapplicable to tax increases necessary to provide services required under the Indigent Health Care and Treatment Act). In addition, in Senate Bill 351, the legislature amended the definition of "taxing unit" to include the CEDs. *See* Acts 1991, 72d Leg., ch. 20, § 13, at 411 (amending section 1.04(12) of the Tax Code).

On the other hand, the characteristics of the CEDs suggest that the truth-in-taxation provisions do not apply. A CED is not a typical taxing unit; it does not establish its own budget and adopt a tax rate sufficient to generate the revenue necessary to meet that budget. Rather, the legislation creating the CEDs, in effect, establishes the tax rate for each CED. Section 20.945(a) of the Education Code directs each CED to "levy a tax at a rate necessary to collect its local fund assignment under Section 16.252 of this code . . . ." Section 16.252 defines a CED's local fund assignment as the product of a specified tax rate[6] and the taxable value of the property in the CED for the prior tax year as determined by the comptroller under section 11.86 of the Education Code. This formula gives the CEDs no discretion in setting their tax rates.[7] *See Edgewood IV*, 826 S.W.2d at 500 (holding that Senate Bill 351 establishes an unconstitutional statewide property tax because the state leaves the CEDs no discretion in setting their tax rates or distributing the revenue they raise).

Given these circumstances, you ask if a CED is required to calculate effective and rollback tax rates, publish notices, and hold a hearing before adopting the required tax rate. You also indicate that the formula for setting the tax rate will result in a 1992-1993 rate sufficient to subject all the CEDs to a rollback election.

---

[6]For the 1991-1992 school year, the specified tax rate was $0.72 per hundred dollars valuation; for the 1992-1993 school year, the specified tax rate will be $0.82 per hundred dollars valuation. Educ. Code § 16.252.

[7]To calculate the actual tax rate for the year, a CED needs to use the taxable value of its property for the current year and figure out what tax rate will allow it to collect its local fund assignment. The tax rate necessary to permit a CED to collect its local fund assignment may differ from the tax rate used to calculate the local fund assignment because the CED must figure in the collection rate and any other applicable adjustments. Even considering these adjustments, Senate Bill 351 does not give the CEDs any real discretion in setting their tax rates. *See Edgewood IV*, 826 S.W.2d at 501.

Therefore, you ask whether a CED must call a rollback election if it is presented with a valid petition. If we answer either of these questions affirmatively, you then ask whether the CEDs are governed by the truth-in-taxation provisions pertaining to school districts or those pertaining to other taxing units. In addition, if we determine that a CED must call a rollback election, you ask what tax rate the CED must adopt if the rollback election succeeds.

These questions require us to resolve a conflict between general provisions and special provisions dealing with the same subject. Both the truth-in-taxation provisions and the relevant portions of Senate Bill 351 deal with setting tax rates and levying taxes: The truth-in-taxation provisions apply to taxing units in general, and Senate Bill 351 contains specific provisions that deal with how CEDs set tax rates and levy taxes. The conflict arises because the truth-in-taxation provisions tell taxing units how to exercise their discretion in setting tax rates, while Senate Bill 351 essentially tells the CEDs that they have no discretion.

When construing statutes, we must determine the intent of the legislature and construe the statutes so that they will accomplish the legislature's purposes. *Brown v. Owens*, 674 S.W.2d 748, 750 (Tex. 1984). In a problem involving a conflict between general provisions and special provisions dealing with the same subject, we must attempt to harmonize the provisions if possible. If, however, the general provisions and the special provisions are irreconcilable, then the special provisions prevail unless the general provisions were enacted after the special provisions and the manifest intent was that the general provisions prevail. Gov't Code § 311.026. When special provisions prevail over general provisions, the special provisions become an exception to the general provisions on the theory that the special provisions more accurately express the legislature's intent. *State v. Jones*, 570 S.W.2d 122, 123 (Tex. Civ. App.--Austin 1978, no writ).

The intent behind Senate Bill 351 was to remedy the defects in the school-financing system identified by the Texas Supreme Court in *Edgewood Independent School District v. Kirby*, 777 S.W.2d 391, 394 (Tex. 1989) (hereafter *Edgewood I*) and in *Edgewood Independent School District v. Kirby*, 804 S.W.2d 491 (Tex. 1991) (hereafter *Edgewood II*). In *Edgewood I*, the court held that the school-financing system then in effect did not make suitable provisions for an "efficient" system of education to accomplish a "general diffusion of knowledge" as required by article

VII, section 1 of the Texas Constitution.[8]  Following this decision, the legislature passed Senate Bill 1,[9] which the court also declared unconstitutional under article VII, section 1.  *See Edgewood II*, 804 S.W.2d 491.  The legislature then passed Senate Bill 351.[10]

The problem that caused the supreme court to declare the school-financing system unconstitutional in both *Edgewood I* and *Edgewood II* arose from the effect of a school district's property wealth on the amount of revenue available to that district and the tax effort required of the district to raise sufficient revenue.  The school-financing systems at issue in both cases required each local school district to raise about fifty percent of its revenue from local property taxes.  *Edgewood I*, 777 S.W.2d at 392; *Edgewood II*, 804 S.W.2d at 496.  Therefore, the property-rich school districts could tax low and spend high, while the property-poor districts had to tax high merely to spend low.  *Edgewood I*, 777 S.W.2d at 393.  Although the court refused to tell the legislature what kind of system would pass constitutional muster, the court did state that "[t]here must be a direct and close correlation between a district's tax effort and the educational resources available to it; in other words, districts must have substantially equal access to similar revenues per pupil at similar levels of tax effort." *Id.* at 397; *see also Edgewood II*, 804 S.W.2d at 496.

The CEDs are the most significant new feature of the school-financing system created by Senate Bill 351.  They are groups of local school districts[11] consolidated for the limited purpose of exercising a portion of the taxing power already granted to the component school districts.  Educ. Code § 20.942.  The school

---

[8]Article VII, section 1 of the Texas Constitution provides:

> A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools.

[9]Acts 1990, 71st Leg., 6th C.S., ch. 1, at 1.

[10]The Texas Supreme Court has not ruled or commented on the constitutionality of Senate Bill 351 under article VII, section 1.

[11]One hundred and fifty-seven of the CEDs consist of all the school districts in a single county. The remaining thirty-one CEDs consist of all the school districts in two or more counties. *See* Educ. Code § 20.941(a)-(b).

districts within each CED were selected to ensure that no CED has taxable property worth more than $280,000 per weighted student in average daily attendance. *Id.* § 20.941(c).

The CEDs levy and collect taxes to fund the first tier of a two-tier financing system.[12] *Id.* § 16.251(b). In the first tier, each school district receives a specific allotment for each student in average daily attendance.[13] This allotment comes from three sources: (1) the school district's share of the revenue collected by the CED; (2) the state available school funds distributed to the school district; and (3) a grant from the commissioner of eduction equal to the difference between the district's tier-one entitlement and the amount the district receives from the other two sources. *Id.*

The legislature directed the CEDs to raise the revenue they need for this tier by levying and collecting taxes on all property within the CED at the tax rate necessary to raise its local fund assignment. *Id.* §§ 20.945(a), 16.252(a). The CED then divides the revenue it raises from this tax among the school districts within the CED, as directed by the commissioner of education. *Id.* § 16.501(a), (b). Because affluent and poor school districts are combined in the CEDs, the CEDs recapture and redistribute property tax revenue from the component school districts: The poorer school districts receive back more than they contribute in tier-one revenue, while the affluent school districts receive back less than they contribute. Yudof, *School Finance Reform: Don't Worry, Be Happy*, 10 REV. LITIG. 585, 593 (1991). This system of levying and distributing tax revenue serves to equalize the amount of revenue the component school districts receive from similar tax effort.

Because the notice and hearing requirements of the truth-in-taxation provisions can be harmonized with this financing scheme and its purpose, we

---

[12]School districts are also permitted to levy taxes beyond those necessary to fund these two tiers, up to a certain limit. *See Educ. Code* § 20.09.

[13]The allotment for each district consists of a basic allotment with any applicable adjustments plus special allotments. For the 1991-1992 school year, the basic allotment was $2,200; for the 1992-1993 school year, the basic allotment will be $2,400. Educ. Code § 16.101. The basic allotment is adjusted to reflect geographic variations in resource costs and the costs of education due to factors beyond the district's control. *Id.* § 16.102. The basic allotment is also adjusted for particularly small or sparsely populated districts. *Id.* §§ 16.103, 16.104. In addition to the basic allotment, each school district receives special allotments for various programs such as special education. *Id.* §§ 16.151-.160.

conclude that the CEDs are required to publish notices and hold hearings before adopting their actual tax rates. Requiring CEDs to give notice and hold public hearings will not impose any inconsistent duties on the CEDs: The CEDs can still levy and collect taxes at a rate sufficient to raise their local fund assignments, and they can still distribute the taxes they collect as directed by the commissioner of education. In addition, applying the notice and hearing requirements of the truth-in-taxation provisions to CEDs would advance one purpose behind the truth-in-taxation provisions without impairing this school-financing scheme. Even though the CEDs cannot reduce their tax rates in response to taxpayer pressure, requiring the CEDs to give the taxpayers notice and hold public hearings will still help educate the taxpayers.

Furthermore, publishing notices and holding hearings as required by the truth-in-taxation provisions will not impose a significant new burden on the CEDs. The Texas Education Agency informs us that it already requires the CEDs to publish notices and hold hearings. To comply with the truth-in-taxation provisions, the CEDs must simply make sure that the notices they publish conform to the requirements in sections 26.04(e) and 26.06 of the Tax Code and that the hearings they hold meet the standards set in sections 26.05(d) and 26.06 of the Tax Code.

We also conclude that the CEDs are school districts for the purposes of applying the truth-in-taxation provisions. Senate Bill 351 defines the CEDs as independent school districts. *See* Educ. Code § 20.942.[14] In addition, the same section provides that the CEDs were established for the limited purpose of exercising part of the taxing power possessed by the component school districts. *See id.* Because the CEDs exercise part of the taxing power formerly held by the component school districts, the rationale for treating school districts differently than other taxing units applies to CEDs as well.

As school districts, the CEDs must use the rollback-rate formula contained in section 26.08(a) of the Tax Code rather than the formula contained in section 26.04(c)(2). Before the legislature enacted Senate Bill 351, both school districts and other taxing units were required to calculate their rollback tax rates using a formula that allowed them to increase their tax rates by eight percent before triggering the

---

[14]Other sections of the Education Code state that "school district" does not include a CED unless the context clearly indicates otherwise. However, these sections apply only to the Education Code. *See* Educ. Code §§ 1.05, 16.010.

possibility of a rollback election. In Senate Bill 351, however, the legislature amended section 26.08(a), changing the formula for calculating a school district's rollback tax rate.[15] *See* Acts 1991, 72d Leg., ch. 20, § 20. This amendment permits school districts to raise their tax rates eight cents, rather than eight percent, before triggering the possibility of a rollback election. Other taxing units are still restricted to an eight percent increase and must calculate their rollback rates accordingly. *See* Tax Code §§ 26.04(c)(2), 26.07.0

You also ask whether a CED must call a rollback election if it is presented with a valid petition and what tax rate a CED must adopt if a rollback election succeeds. However, because CEDs are school districts for the purposes of applying the truth-in-taxation provisions, we do not need to answer these questions. A successful rollback election during the 1992-1993 school year would merely require a CED, as a school district, to limit its tax increase during the 1993-1994 school year, *see* Tax Code § 26.08, and the supreme court has enjoined the CEDs from levying and collecting taxes after the 1992-1993 school year.

---

[15]Actually, by amending section 28.08(a), the legislature changed only the formula for determining when the taxpayers can petition for a rollback election. The legislature did not amend the provisions of the Tax Code that prescribe the formula for the rollback rate a school district must publish or the formula for determining when a school district must publish notices and hold a public hearing before adopting a tax rate. *See* Tax Code §§ 26.04(c)(2), 26.05(d).

However, requiring school districts to publish a rollback rate different than the one used to determine the actual rollback would be unreasonable and absurd. Even when the literal language of a statute supports one construction of a statute, we do not have to adopt that construction when it would lead to an unreasonable and absurd result. Rather, we must look at the intent of the legislature and adopt a construction that will further that intent. *See* Gov't Code § 311.021; *Salas v. State*, 592 S.W.2d 653, 655 (Tex. Civ. App.--Austin 1979, no writ). The purposes behind the truth-in-taxation provisions would not be served by requiring a school district to use different rollback tax rates at different stages in the truth-in-taxation process; this procedure would confuse the taxpayers rather than help educate them. Therefore, despite the statutory language, we conclude that the school districts need to use the same formula to calculate the tax rates they publish as they do to determine whether the taxpayers can insist on a rollback election.

## S U M M A R Y

The county education districts (CEDs) must comply with the notice and hearing requirements of the truth-in-taxation provisions contained in sections 26.04 through 26.06 of the Tax Code. These requirements are consistent with Senate Bill 351, which creates the CEDs and indicates how they should set their tax rates, levy their taxes, and distribute the tax revenue they collect. For the purpose of satisfying the truth-in-taxation provisions, the CEDs are school districts. Therefore, the CEDs must use the formula contained in section 26.08(a) of the Tax Code to calculate their rollback tax rates. In addition, because the Texas Supreme Court has enjoined the CEDs from levying and collecting taxes after the 1992-1993 school year, we do not need to determine whether a CED must call a rollback election if it receives a petition.

Very truly yours,

DAN MORALES
Attorney General of Texas

WILL PRYOR
First Assistant Attorney General

MARY KELLER
Deputy Assistant Attorney General

RENEA HICKS
Special Assistant Attorney General

MADELEINE B. JOHNSON
Chair, Opinion Committee

Prepared by Margaret A. Roll
Assistant Attorney General