MIAMI INDEPENDENT SCHOOL
DISTRICT, Appellant,

v.

Dr. Mike MOSES; Texas Education Agen-
cy; Hutto Independent School District;
and Mission CISD, Appellees.

No. 03–98–00326–CV.

Court of Appeals of Texas,
Austin.

March 25, 1999.

Don M. Dean, Underwood, Wilson, Berry, Stein & Johnson, P.C., Amarillo, for Appellant.

Doug W. Ray, Ray, Wood & Fine, L.L.P., Austin, for Hutto ISD & Mission CISD.

John Cornyn, Atty. Gen., Toni Hunter, Asst. Atty. Gen., General Litigation Division, Austin, for Dr. Mike Moses & Texas Education Agency.

Before Chief Justice ABOUSSIE, Justices JONES and B.A. SMITH.

BEA ANN SMITH, Justice.

Appellant Miami Independent School District ("Miami ISD") filed suit seeking a declaratory judgment that section 39.112 of the Texas Education Code, which makes exemplary school districts exempt from "requirements and prohibitions" imposed under the Education Code, removes exemplary school districts from the wealth equalization provisions contained in chapter 41 of the Education Code. Following a bench trial, the trial court held that it does not. Appellant brings eight points of error challenging the final judgment rendered by the trial court in favor of appellees, Dr. Mike Moses [1] and the Texas Education Agency (the "TEA"). We will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Miami ISD is a rural school district located approximately eighty miles from Amarillo; it consists of a single campus of only 192 students. While small, it is a relatively wealthy district, largely due to local oil and gas production. Appellant's wealth per student [2] exceeds $280,000, the maximum amount permitted under chapter 41 of the Texas Education Code. Tex. Educ.Code Ann. § 41.002(a) (West 1996) (hereinafter the "Code").[3] Districts with a wealth per student in excess of $280,000 are required to take any combination of the following actions to achieve an equalized wealth level: (1) consolidation with other school districts; (2) detachment of territory; (3) purchase of average daily attendance credit; (4) contracting for the education of non-resident students; or (5) tax base consolidation with another school district. Id. § 41.003.

The State Board of Education evaluates the performance of school districts [4] and assigns each district one of four possible rat-

1. Dr. Moses is a party in his status as Commissioner of Education.

2. "Wealth per student" is a term of art defined as "the taxable value of property ... divided by the number of students in weighted average daily attendance." Tex. Educ.Code Ann. § 41.001(2) (West 1996).

3. Unless otherwise noted, all statutory references herein are to the Texas Education Code.

4. The performance indicators used to evaluate each school district include the following: (1) the results of TAAS tests, which assess competency in reading, writing, mathematics, social studies, and science; (2) drop-out rates within the district; (3) student attendance rates; (4) the percentage of graduating students who attain passing scores on the secondary exit-level tests; (5) the percentage of graduating students who meet the course requirements established for the recommended high school program by State Board of Education rule; (6) the results of the Scholastic Achievement Test (SAT) and the American College Test (ACT); (7) the percentage of students taking end-of-course assessment instruments; (8) the percentage of students exempted from the assessment program; and (9) any other indicator the State Board of Education adopts. See Tex. Educ.Code Ann. § 39.051(b) (West 1996).

ings: "exemplary," "recognized," "academically acceptable," and "academically unacceptable." *Id.* § 39.072. Miami ISD received an "exemplary" rating for the 1997–98 school year. It filed suit under the Uniform Declaratory Judgments Act[5] in October 1997, seeking a declaration that it is exempt from chapter 41's wealth equalization provisions due to its exemplary rating. Appellant's argument, both here and before the trial court, is based on section 39.112 of the Code, which provides that a "school campus or district that is rated exemplary is exempt from requirements and prohibitions imposed under this code, including rules adopted under this code." Code § 39.112(a) (West 1996). Miami ISD claims that chapter 41's wealth equalization provisions are among the "requirements and prohibitions" imposed under the Code, and therefore its status as an exemplary district for 1997–98 allows it to avoid participating in the statewide wealth equalization system implemented by chapter 41.

In December 1997, in conjunction with the trial court's issuance of a temporary injunction in its favor, Miami ISD executed an agreement to purchase attendance credits under section 41.002(a)(3). It then tendered into the registry of the court a total of $815,-328, representing the amount it owed under that section. After appellees filed an answer to appellant's petition, Alice Independent School District and 126 other school districts statewide filed a plea in intervention and a motion to consolidate the present action "with the cause entitled *Edgewood I.S.D. v. Meno,* and bearing docket number 362,516."[6] Appellant moved to strike the plea.

After a hearing on both motions, the trial court granted counsel for the 127 intervening districts time to secure a resolution from each district's board of trustees authorizing counsel to represent its school district in this action. Ultimately, counsel filed proof of authority for two districts, Hutto Independent School District and Mission Consolidated Independent School District (the "Intervenors"), and the court overruled the motion to strike as to those two districts. The trial court granted *amicus curiae* status to the remaining 125 districts that had sought to intervene. However, the court denied the motion to consolidate.

Following a bench trial, the district court rendered a final judgment in favor of appellees, declaring that Miami ISD is not exempt from chapter 41 and must comply with its wealth equalization provisions. In its findings of fact and conclusions of law, the court reviewed the legislative history of the excellence exemptions and wealth equalization provisions and concluded that the legislature did not intend to immunize exemplary districts from the latter. It observed that under appellant's interpretation of section 39.112, property-rich exemplary districts, which already have significantly more money than other districts in the equalized system, would receive even more money while property-poor exemplary districts would not. This reading of the statute would cost the State approximately $56,000,000 annually, due to the State's obligation to fund the equalized system.[7] The trial court also expressed skepticism at the idea that the legislature intended to lavish money on districts that were already exceeding the State's educational goals, at a time when the legislature was emphasizing accountability and trimming costs. Declaring appellant's construction "so inequitable as to raise serious questions about its constitutionality," the court found that the language of section 39.112 does not compel the result urged by Miami ISD. The trial court vacated the temporary injunction and ordered that the funds in its registry be released to the TEA after thirty days.

5. Tex. Civ. Prac. & Rem.Code Ann. §§ 37.001–.011 (West 1997).

6. It does not appear that any cause with this docket number was pending at the time of the motion to consolidate; 362,516 was the docket number in another school district matter decided by this Court in 1995. *See Calhoun County Indep. Sch. Dist. v. Meno,* 902 S.W.2d 748 (Tex. App.—Austin 1995, writ denied).

7. Joseph Wisnoski, Coordinator for School Financing Fiscal Analysis for the TEA, testified at trial that there are fourteen school districts that were both rated exemplary for 1997–98 and subject to chapter 41; he further testified that the estimated amount lost from these schools annually would total approximately $55,678,580.

Miami ISD raises eight issues on appeal. In its first four issues, it claims the trial court erred in rejecting the argument that section 39.112 makes exemplary school districts exempt from chapter 41's wealth equalization provisions. In its fifth issue, appellant argues that the trial court's judgment is based on hypothetical issues and constitutes an advisory opinion. In its sixth issue, Miami ISD argues that the trial court misinterpreted uncontroverted evidence concerning the lack of impact that this case would have on the constitutionality of the school finance system. In its seventh and eighth issues, appellant alleges that the trial court erred in failing to strike the Intervenors' pleadings and in allowing the Intervenors to join this action.

## DISCUSSION

Appellant's first four issues all relate to the same central question: Does the "requirements and prohibitions" language in section 39.112 make exemplary school districts exempt from chapter 41's wealth equalization provisions? Before we address this question, a brief review of the recent history of Texas's public school financing is helpful.

In 1989, the Texas Supreme Court considered a challenge to the school finance system in which about forty-two percent of total statewide education costs came from the State and eight percent from various sources, including federal funds; the remaining fifty percent was raised by school districts, mostly through the local *ad valorem* property tax system. *See Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391, 392 (Tex.1989) (*Edgewood I*). The supreme court held that due to the vast disparities in the tax bases of wealthy and poor districts and the resulting inability of poorer districts to generate sufficient funds even at increased tax rates, the existing system violated the "efficiency" mandate of article VII, section 1 of the Texas Constitution. *See id.* at 393; Tex. Const. art. VII, § 1. The legislature's first two attempts to restructure the school finance system in response to *Edgewood I* were rejected by the supreme court. *See Edgewood Indep. Sch. Dist. v. Kirby,* 804 S.W.2d 491 (Tex.1991) (*Edgewood II*); Carrollton–Farmers Branch

*Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489 (Tex.1992) (*Edgewood III*).

In 1993, the legislature enacted Senate Bill 7, which created a two-tiered educational finance structure known as the Foundation School Program. Act of May 28, 1993, 73d Leg., R.S., ch. 347, § 1.01, 1993 Tex. Gen. Laws 1479. Tier One's goal was to guarantee sufficient financing for all school districts to provide a basic program of education that meets accreditation and other legal standards. *See* Code § 42.002(b)(1)(A) (West 1996) (formerly Code § 16.002(b)). Tier Two created a guaranteed yield system, the goal of which was to provide each school district with the opportunity to supplement the basic program at a level of its own choice. *See* Code § 42.301 (formerly Code § 16.301). A major funding source for the revised system is the $280,000 cap on each district's per-student wealth, which "recaptures" funds in excess of the cap and uses them to fund the equalization process. *See* Code § 41.002.

Four years ago, the supreme court rejected constitutional challenges to Senate Bill 7's two-tiered system from both property-rich and property-poor school districts. *See Edgewood Indep. Sch. Dist. v. Meno,* 917 S.W.2d 717 (Tex.1995) (*Edgewood IV*). In *Edgewood IV,* the supreme court described the $280,000 cap as the "cornerstone of Senate Bill 7's funding mechanism," because it allows the State to "tap the reservoirs of taxable property situated in property-rich districts." *Id.* at 734. However, the court specifically stated that its judgment "should not be interpreted as a signal that the school finance crisis in Texas has ended," observing that the system created by Senate Bill 7 "becomes minimally acceptable only when viewed through the prism of history." *Id.* at 725–26. The previous system judged unconstitutional had insulated concentrated areas of property wealth from being taxed to support the statewide public school system, resulting in an inefficient system. As the supreme court recognized, Senate Bill 7 "continues the State's movement toward efficiency" by providing even the poorest districts with vastly improved access to revenue. *Id.* at 734. With this background in

mind, we turn now to the interpretation of the phrase "requirements and prohibitions" found in section 39.112.

*Standard of Review*

Miami ISD argues that the "requirements and prohibitions" language excuses exemplary school districts from chapter 41's wealth equalization provisions. Appellees take the position that section 39.112 refers only to "requirements and prohibitions" in the area of education, not in school structure or finance. Representatives from the TEA testified at trial that the agency has never interpreted the provisions of section 39.112 to exempt a school district from chapter 41 as appellant urges.

 Our objective when we construe a statute is to determine and give effect to the legislature's intent. *See Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.,* 966 S.W.2d 482, 484 (Tex.1998). We may consider the purpose and intent of the law, giving due deference to the interpretation placed upon the provision by the agency. *See Texas Citrus Exch. v. Sharp,* 955 S.W.2d 164, 168 (Tex.App.—Austin 1997, no pet.) (op. on reh'g). We give serious consideration to an agency's construction of a statute that it is charged with enforcing, so long as the interpretation is reasonable and does not contradict the plain language of the statute. *See id.* In interpreting a statute, a court may consider (1) the object sought to be attained; (2) the circumstances under which the statute was enacted; (3) the legislative history; (4) the consequences of a particular construction; and (5) the administrative construction of the statute. *See* Tex. Gov't Code Ann. § 311.023 (West 1988).

*"Requirements and Prohibitions"*

 Section 39.112 provides, in pertinent part:

(a) Except as provided by Subsection (b), a school campus or district that is rated exemplary is exempt from requirements and prohibitions imposed under this code including rules adopted under this code.

(b) A school campus or district is not exempt under this section from:

(1) a prohibition on conduct that constitutes a criminal offense;

(2) requirements imposed by federal law or rule, including requirements for special education or bilingual education programs; or

(3) a requirement, restriction, or prohibition relating to:

(A) curriculum essential knowledge and skills under Section 28.002 or minimum graduation requirements under Section 28.025;

(B) public school accountability as provided by Subchapters B, C, D, and G;

(C) extracurricular activities under Section 33.081;

(D) health and safety under Chapter 38;

(E) competitive bidding under Subchapter B, Chapter 44;

(F) elementary school class size limits, except as provided by Subsection (d) or Section 25.112;

(G) removal of a disruptive student from the classroom under Subchapter A, Chapter 37;

(H) at risk programs under Subchapter C, Chapter 29;

(I) prekindergarten programs under Subchapter E, Chapter 29;

(J) rights and benefits of school employees;

(K) special education programs under Subchapter A, Chapter 29; or

(L) bilingual education programs under Subchapter B, Chapter 29.

Code § 39.112 (West 1996).

Although appellant asserts that the language of section 39.112 is unambiguous, merely reading the text of the statute does not reveal the scope of the phrase "requirements and prohibitions imposed under this code." We will defer to the agency's interpretation as long as it is reasonable and does not contradict the plain language of the statute. *See Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex.1993); *Texas Citrus Exch.,* 955 S.W.2d at 168. Since nothing in the statute clarifies whether "require-

ments and prohibitions" includes chapter 41's wealth equalization provisions, we believe that the TEA's interpretation is reasonable and does not contradict the statute's plain language.

Furthermore, we agree with appellees' contention that appellant's interpretation of section 39.112 is unreasonable. Appellees ask whether exemplary schools would also be exempt from governance by a board of trustees, election of trustees, provisions requiring written contracts for teachers, provisions limiting the issuance of bonds only after authorizing elections, and a host of other provisions. Miami ISD does not argue that the legislature intended exemplary schools to be exempt from any of these "requirements and prohibitions," yet it insists that the plain language of section 39.112 exempts it from the wealth equalization provisions. We believe that the TEA's interpretation—that section 39.112 refers only to *educational* "requirements and prohibitions"—is an inherently more reasonable construction.

It is also the only interpretation supported by legislative history. The existing evaluation and ranking system was enacted in 1989 by the 71st Legislature. *See* Act of May 29, 1989, 71st Leg., R.S., ch. 813, §§ 2.20–.22, 1989 Tex. Gen. Laws 3690–92 (codified at Tex. Educ.Code Ann. § 39.072). The following year, the legislature enacted the provision exempting exemplary districts from requirements and prohibitions imposed under the Education Code. *See* Act of June 6, 1990, 71st Leg., 6th C.S., ch. 1, § 4.01 (codified at Tex. Educ.Code Ann. § 39.112(a)). A House Research Organization Report on the 1990 enactment of the exemplary provisions refers to exemptions from "all state *educational* requirements and prohibitions" (emphasis added). As the district court observed: "Districts that prove they can teach do not need state regulation of their teaching." Appellant has not pointed us to any legislative history indicating that the legislature intended to immunize high-achieving school districts from chapter 41's wealth equalization provisions. We agree with the district court's assessment that the purpose of section 39.112 is to waive state educational over-

sight for districts that achieve the highest standards of educational achievement.

Further support for appellees' interpretation can be found in section 7.056 of the Education Code, which provides that the Commissioner of Education can waive any "requirement" or "prohibition" of the Code upon a district's written request. Code § 7.056(a) (West 1996). Like section 39.112(b), sections 7.056(e) and (f) contain a list of nonwaivable requirements and prohibitions that does not include chapter 41's wealth equalization provisions. Code §§ 7.056(e), (f). If appellant's interpretation were correct, these provisions would indicate that the legislature intended to give the Commissioner the authority to undo the entire school finance system. However, it is apparent from reading section 7.056(b)(1) that the "requirements" and "prohibitions" subject to waiver are those that apply to a district's "achievement objectives" and that section 7.056(d) specifies that the waiver is valid only as long as the district fulfills those objectives and the district's achievement levels do not decline. Code §§ 7.056(b)(1), (d). We are not persuaded that the legislature's failure to include similar clarifying language in section 39.112 should be interpreted to render the incredible result appellant seeks.

When the legislature enacts a statute, it is presumed that "a just and reasonable result is intended." Tex. Gov't Code Ann. § 311.021(3) (West 1988). We also acknowledge the related rule that if more than one interpretation of a statute is available to a court, it must choose one that does not cause serious doubts about the act's constitutionality. *See Federal Sav. & Loan Ins. Corp. v. Glen Ridge I Condominiums, Ltd.,* 750 S.W.2d 757, 759 (Tex.1988). The district court concluded that appellant's interpretation of section 39.112 is "so inequitable as to raise serious questions about its constitutionality." We agree.

The supreme court concluded in *Edgewood IV* that the Texas school finance system is far from perfect, but had evolved sufficiently toward fairness and efficiency to survive constitutional scrutiny. *See Edgewood IV,* 917 S.W.2d at 726–31. The court specifically recognized chapter 41's wealth equalization pro-

visions as the elements most responsible for propelling the system on its slow journey toward efficiency. *See id.* at 734–35. Miami ISD's interpretation would deflate the efficiency procured by the wealth equalization. If wealthier districts that achieve exemplary status were no longer required to contribute to the statewide system, the State would lose a critical funding mechanism while remaining obligated to provide support to property-poor districts. Although money alone cannot ensure excellence in public schools, it is an important component. The loss of approximately $56,000,000 annually in funds that would have been recaptured under chapter 41 from exemplary schools like Miami ISD would be a staggering assault on our constitutionally fragile school finance system.

While section 39.112's "requirements and prohibitions" language is ambiguous, we believe that the TEA's interpretation is not only reasonable, but considerably more logical than the construction urged by appellant. The legislative history of section 39.112, the use of similar phraseology elsewhere in the Education Code, and the absurd consequences that would follow from appellant's interpretation point toward a single conclusion: the legislature did not intend to make exemplary school districts exempt from the $280,000 per-student wealth cap. We further agree that appellant's interpretation would raise serious constitutional concerns, given the history of the school finance litigation and the role of the $280,000 cap in that ongoing struggle. Appellant's first four issues are overruled.

*Hypothetical Issues*

■ In its fifth issue, Miami ISD argues that the trial court erred by basing its decision on hypothetical issues not before the court and issuing an advisory opinion. In its sixth issue, appellant alleges that the district court misinterpreted the uncontroverted evidence before it concerning the lack of impact of this case on the constitutionality of the

school finance system. We will consider these issues together.

Miami ISD argues that the district court considered the consequences of appellant's interpretation on other provisions that, like the wealth equalization provisions, are not specifically enumerated in subsection (b) of section 39.112. Such regulations include: governance by a board of trustees; election of trustees; provisions requiring written contracts for teachers; and provisions limiting the issuance of bonds only after authorizing elections. Appellant urges that "district courts are not in the business of giving advice, nor are they in the business of deciding cases upon speculative, hypothetical or contingent situations," citing *Coalson v. City Council of Victoria*, 610 S.W.2d 744, 747 (Tex.1980).

We agree with the soundness of appellant's propositions. However, the trial court was not deciding hypothetical issues; the present controversy is quite real. In attempting to determine the legislative intent behind section 39.112, the court simply considered the consequences of appellant's construction of that statute, as it is authorized to do. *See* Tex. Gov't Code Ann. § 311.023 (West 1988) ("In construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters . . . the consequences of a particular construction."). The consequences considered by the trial court persuaded it to favor appellees' construction of section 39.112.

Miami ISD also argues that the district court's opinion was advisory because, of the fourteen districts that were both subject to chapter 41 and rated exemplary for 1997–98, it is the only district claiming exemption from the wealth equalization provisions.[8] Since the present suit involves only $951,-216,[9] appellant argues that the court erred in considering the $56,000,000 figure, the approximate amount of recapture that would be lost if all fourteen exemplary districts were to receive the exemption appellant seeks.

8. Trial testimony established that the other thirteen districts all exercised options to reduce their wealth under chapter 41.

9. Appellant deposited six checks for $135,888 into the registry of the court for a total deposit of

$815,328. However, another payment apparently became due after the filing of this appeal; the $951,216 figure represents $815,328 plus another $135,888 payment.

This argument is disingenuous. The trial court was not required to turn a blind eye to the consequences of appellant's construction simply because the other thirteen districts have declined to join appellant's suit. Nor are we. While appellant may be technically correct that $951,216 is the amount at issue in this case, Miami ISD has apparently never disputed that exempting all fourteen similarly situated districts would cause the State to lose approximately $56,000,000 annually in recapture funds. The district court did not err in considering this very real consequence of appellant's interpretation of section 39.112. We overrule appellant's fifth and sixth issues.

*The Intervenors*

In its seventh issue, Miami ISD argues that the trial court erred in failing to strike the Intervenors' pleadings when Mr. Randall Wood failed to show authority to represent any of the 127 districts seeking to intervene in the present action. Appellant cites to Rule of Civil Procedure 12, which states:

A party in a suit or proceeding pending in a court of this state may, by sworn written motion stating that he believes the suit or proceeding is being prosecuted or defended without authority, cause the attorney to be cited to appear before the court and show his authority to act. . . . At the hearing on the motion, the burden of proof shall be upon the challenged attorney to show sufficient authority to prosecute or defend the suit on behalf of the other party. Upon his failure to show such authority, the court shall refuse to permit the attorney to appear in the cause, and shall strike the pleadings if no person who is authorized to prosecute or defend appears.

Tex.R. Civ. P. 12. Appellant claims that the trial court erred in granting Mr. Wood ninety days to secure resolutions authorizing intervention from each district's board of trustees.

At the February 3, 1998 hearing on appellant's Rule 12 motion, Mr. Wood produced evidence that a five-member committee had been organized in the mid–1980's to manage lawsuits involving *Edgewood* issues. Mr. Wood took the position that he was authorized through the "*Edgewood* committee" to represent the 127 districts then attempting to intervene. Counsel for Miami ISD argued that Texas law requires a school district to act by and through its board of trustees. *See Favero v. Huntsville Indep. Sch. Dist.*, 939 F.Supp. 1281, 1294 (S.D.Tex.1996), *aff'd*, 110 F.3d 793 (5th Cir.1997). Appellant also cites section 11.151 of the Education Code, which provides that the trustees of an independent school district may sue and be sued in the name of the district. Code § 11.151 (West 1996). The trial court did not rule on appellant's motion at the hearing, announcing instead its intention to carry the motion.

When trial began on March 30, Mr. Wood had received authorization from only the Hutto and Mission Consolidated districts; the trial court overruled appellant's motion as to those districts. The court also granted amicus status to the remaining 125 districts, which ruling appellant has not challenged. Therefore, the court did not allow Mr. Wood to represent the 127 districts seeking intervention. We are not persuaded either that the trial court was required to rule on the motion at the hearing, or that Rule 12 prohibited the court from granting Mr. Wood time to attempt to secure authorization from each district's board of trustees. Nor has appellant cited any authority for either of those propositions. We overrule appellant's seventh issue.

In its eighth and final issue, Miami ISD claims that the trial court erred by failing to grant appellant's motion to strike the Intervenors' plea in intervention. Appellant cites Texas Rule of Civil Procedure 60, which provides that an intervening party may be "stricken out by the court for sufficient cause on the motion of any party." Tex.R. Civ. P. 60. A person or entity has the right to intervene in an action if: (1) the intervenor could have brought the action in his own name, or (2) had the action been brought against him, he would have been able to defeat recovery of some part thereof. *See Guaranty Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990). A trial court has broad discretion in deciding whether to allow an intervention. *See id.*

Miami ISD argues that under the facts of the present case, no judgment could have been entered for the Intervenors on their pleas. Appellant cites *City of Dallas v. Trammell,* 96 S.W.2d 110 (Tex.Civ.App.— Dallas 1936), *rev'd on other grounds,* 129 Tex. 150, 101 S.W.2d 1009 (1937), in support of its argument that the trial court erred in failing to strike the Intervenors' pleas. It also cites *Hopwood v. State,* 21 F.3d 603 (5th Cir.1994), for the proposition that the Intervenors failed to show that they had an interest separate from that of appellees or that appellees would not adequately represent them. We find both cases distinguishable.

*Trammell* involved a suit by a retired police officer to compel the pension board to restore his monthly pension payment to the amount it had been when he retired. In affirming the trial court's judgment for the plaintiff, the court of appeals held that the trial court had not erred in striking the pleas of a number of other pensioners who sought to intervene on behalf of the defendant city. *See Trammell,* 96 S.W.2d at 113. Appellant relies on the court of appeals' statement: "No judgment could have been entered for intervenors on their pleas, and the mere fact that it was to their interest that [Trammell] should not prevail did not give them a right to intervene." *Id.*

▇▇ First, we note that the court of appeals' judgment affirming judgment for the plaintiff was reversed by the supreme court on another ground; therefore, the case is not binding precedent. Second, *Trammell*'s declaration that the intervenors' interest in the controversy was not sufficient to permit intervention appears to conflict with the modern rule of intervention as embodied in Rule 60. As this Court has explained:

> Anyone may intervene in a legal proceeding to which he is not originally a party in order to protect a right or interest which he has and which will be affected by the litigation. An intervenor must show some present legal or equitable interest in the subject matter which makes it proper for him to participate in the proceeding.

*McCord v. Watts,* 777 S.W.2d 809, 811 (Tex. App.—Austin 1989, no writ) (citing 1 McDonald *Texas Civil Practice* §§ 3.46, 3.47

(rev: ed.1981)). The intervenors have a real interest in this dispute: their interest in a constitutionally efficient and equitable school system. It is for this reason that school districts have both brought and intervened in suits since *Edgewood I* to determine whether legislative enactments comport with Texas constitutional provisions on school finance. *See, e.g., Calhoun County Indep. Sch. Dist. v. Meno,* 902 S.W.2d 748, 749 (Tex.App.—Austin 1995, writ denied) (ninety-two districts intervened to prevent plaintiff district from obtaining an extended reduction in the taxable value of the district's property by lengthening the duration of an existing tax-abatement agreement with a commercial entity). There is no serious question as to the Intervenors' interest in the present dispute.

As the Intervenors point out, *Hopwood* involved an application of Federal Rule of Civil Procedure 24. *See Hopwood,* 21 F.3d at 605. While adequacy of representation is an element under Federal Rule 24, Rule 60 is not derived from the federal rule. *See* 1 McDonald *Texas Civil Practice* § 5:78, at 603 n. 619 (Diane M. Allen et al. eds., 1992). The parties have not cited any cases applying an "adequacy of representation" requirement to an intervention under Texas's Rule 60, and we have found none. Therefore, we do not find *Hopwood* persuasive in the present circumstances. The trial court did not abuse its discretion in refusing to strike the Intervenors' pleas.

Even if it could be said that the trial court erred, we do not see how any such error was harmful. Texas Rule of Appellate Procedure 44.1 provides that no judgment in a civil case may be reversed unless the error complained of probably caused the rendition of an improper judgment. Tex.R.App. P. 44.1(a)(1). Appellant does not argue that it has been harmed in any way by the Intervenors' presence in the case, only that the trial court erred in failing to strike their pleas. Assuming that the court's decision was in error, we are not persuaded that the error probably caused the rendition of an improper judgment. Appellant's eighth issue is overruled.

## CONCLUSION

The trial court properly ruled that section 39.112 of the Education Code does not make

exemplary school districts exempt from chapter 41's wealth equalization provisions. Although the phrase "requirements and prohibitions" is ambiguous, we conclude that the TEA's interpretation of that phrase to refer to educational requirements and prohibitions is a reasonable one that does not contradict the plain language of section 39.112. It is also a construction supported by both the legislative history of section 39.112 and the use of similar phraseology in other sections of the Education Code. We conclude that adopting appellant's interpretation of section 39.112 would strain the constitutionality of the current school financing system under *Edgewood IV* and produce absurd results. Appellant's other issues are without merit. We therefore affirm the trial court's judgment.