IN THE SUPREME COURT OF 
TEXAS


No. 02-0427
  
West Orange-Cove Consolidated 
I.S.D.
et al., Petitioners

v.

Felipe Alanis, in his official 
capacity as
the Commissioner of Education, et 
al., Respondents

On Petition for Review from the


Court of Appeals for the Third District of Texas
  

Argued March 27, 2003

 
Justice Hecht delivered the opinion of the Court, in which Chief Justice 
Phillips, Justice Owen, Justice O'Neill, Justice Jefferson, Justice Schneider, 
and Justice Wainwright joined.
Justice Enoch filed a concurring opinion.
Justice Smith filed a dissenting opinion.
 
Article VIII, section 1-e of the Texas Constitution states: "No State ad 
valorem taxes shall be levied upon any property within this State." 
(1) We have held that "[a]n ad valorem tax is a state tax when it is 
imposed directly by the State or when the State so completely controls the levy, 
assessment and disbursement of revenue, either directly or indirectly, that the 
[taxing] authority employed is without meaningful discretion." 
(2)
The maintenance and operation of Texas public schools are funded mostly by ad 
valorem taxes levied by local school districts under comprehensive state 
regulation that, among other things, caps the rates at which districts can tax 
and redistributes local revenue among districts. In 1995, we held that the 
State's control of this school funding system had not made local property taxes 
an unconstitutional state tax because school districts retained meaningful 
discretion in generating revenue, but we foresaw a day when increasing costs of 
education and evolving circumstances might force local taxation at maximum 
rates. 
(3) At that point, we said, the conclusion that a state property tax 
had been levied would be "unavoidable". 
(4)
In the case before us, four plaintiff school districts allege that that day 
has come. Specifically, they contend that they and other districts have been 
forced to tax at maximum rates set by statute in order to educate their 
students. These taxes, they say, have become indistinguishable from a state ad 
valorem tax prohibited by article VIII, section 1-e.
The district court dismissed the case on the pleadings, holding that a 
constitutional violation could not be alleged because far fewer than half of 
Texas' 1,035 school districts were taxing at the maximum rates allowed. The 
court of appeals affirmed, focusing not on how many districts were taxing at 
maximum rates but on whether any of them were forced to do so just to provide an 
accredited education as defined by statute. 
(5) We disagree with both courts and therefore reverse and remand the 
case to the trial court for further proceedings.

I

This is the fifth in a series of cases to come before us challenging the 
constitutionality of the Texas public school finance system on various 
grounds. 
(6) Central to some of the cases and basic to them all is article VII, 
section 1 of the Texas Constitution, which states:
A general diffusion of knowledge being essential to 
the preservation of the liberties and rights of the people, it shall be the duty 
of the Legislature of the State to establish and make suitable provision for the 
support and maintenance of an efficient system of public free schools. 
(7)
By assigning to the Legislature a duty, this section both empowers and 
obligates. It gives to the Legislature the sole authority to set the policies 
and fashion the means for providing a public school system. 
(8) Thus we have said that "[w]e do not prescribe the means which the 
Legislature must employ in fulfilling its duty." 
(9) But the provision also requires the Legislature to meet three 
standards. First, the education provided must be adequate; that is, the public 
school system must accomplish that "general diffusion of knowledge 
. . . essential to the preservation of the liberties and rights of the 
people". Second, the means adopted must be "suitable". Third, the system itself 
must be "efficient". "[T]hese are admittedly not precise terms," as we have 
acknowledged, but "they do provide a standard by which this court must, when 
called upon to do so, measure the constitutionality of the legislature's 
actions." 
(10) The final authority to determine adherence to the Constitution 
resides with the Judiciary. 
(11) Thus, the Legislature has the sole right to decide how 
to meet the standards set by the people in article VII, section 1, and the 
Judiciary has the final authority to determine whether they have been 
met. 
(12)
In 1989, we decided Edgewood I, the first case challenging the 
constitutionality of the public school finance system under article VII, section 
1. The system's principal component for funding maintenance and operations was 
the Foundation School Program, a two-tiered mechanism that the Legislature had 
set up in 1975. 
(13) The first tier was designed to fund a basic education. 
(14) Every school district that could not, by taxing at a specified 
minimum rate, generate a certain level of revenue per student in "weighted 
average daily attendance" ("WADA" -- weighted by taking into account special 
needs and conditions such as special or bilingual education) was given state 
funds to make up the difference. 
(15) Despite its stated purpose, first-tier funding did not cover the 
cost of meeting bare educational requirements mandated by the Legislature. 
(16) The system's second tier provided state funds to guarantee a 
certain level of additional revenue per student in WADA for each penny a school 
district increased its tax rate above the prescribed minimum. 
(17) School district tax rates were capped at $1.50 per $100 property 
valuation 
(18) as they had been for decades. 
(19) Smaller components of the school finance system were the 
Available School Fund established by the Constitution, 
(20) which provided all school districts about $300 per student, 
(21) and federal funding. 
(22) Facilities and other expenses were funded separately. 
(23)
Then, as now, local ad valorem taxes supplied more than half the funding for 
public schools, 
(24) the tax bases of the more than 1,000 school districts, and 
consequently the tax revenue available to them, were vastly different, 
(25) and state tax revenues were inadequate to level local funding 
disparities. 
(26) At that time, local tax revenues were not redistributed among 
school districts as they are now. We described the situation thus:
There are glaring disparities in the abilities of 
the various school districts to raise revenues from property taxes because 
taxable property wealth varies greatly from district to district. The wealthiest 
district has over $14,000,000 of property wealth per student, while the poorest 
has approximately $20,000; this disparity reflects a 700 to 1 ratio. The 300,000 
students in the lowest-wealth schools have less than 3% of the state's property 
wealth to support their education while the 300,000 students in the 
highest-wealth schools have over 25% of the state's property wealth; thus the 
300,000 students in the wealthiest districts have more than eight times the 
property value to support their education as the 300,000 students in the poorest 
districts. The average property wealth in the 100 wealthiest districts is more 
than twenty times greater than the average property wealth in the 100 poorest 
districts. . . .

* * *

Because of the disparities in district property 
wealth, spending per student varies widely, ranging from $2,112 to $19,333. 
Under the existing system, an average of $2,000 more per year is spent on each 
of the 150,000 students in the wealthiest districts than is spent on the 150,000 
students in the poorest districts.
The lower expenditures in the property-poor 
districts are not the result of lack of tax effort. Generally, the property-rich 
districts can tax low and spend high while the property-poor districts must tax 
high merely to spend low. In 1985-86, local tax rates ranged from $.09 to $1.55 
per $100 valuation. The 100 poorest districts had an average tax rate of 74.5 
cents and spent an average of $2,978 per student. The 100 wealthiest districts 
had an average tax rate of 47 cents and spent an average of $7,233 per student. 
. . . A person owning an $80,000 home with no homestead exemption 
would pay $1,206 in taxes in the east Texas low-wealth district of Leveretts 
Chapel, but would pay only $59 in the west Texas high-wealth district of 
Iraan-Sheffield. Many districts have become tax havens. 
(27)
The plaintiffs in Edgewood I asserted that this public school 
finance system was not efficient within the meaning of article VII, section 1. 
"'Efficient,'" we said, "conveys the meaning of effective or productive of 
results and connotes the use of resources so as to produce results with little 
waste; this meaning does not appear to have changed over time." 
(28) Given these circumstances, a unanimous Court had little 
difficulty concluding that the constitutional standard of efficiency had not 
been met:
We hold that the state's school financing system is 
neither financially efficient nor efficient in the sense of providing for a 
"general diffusion of knowledge" statewide, and therefore that it violates 
article VII, section 1 of the Texas Constitution. Efficiency does not require a 
per capita distribution, but it also does not allow concentrations of resources 
in property-rich school districts that are taxing low when property-poor 
districts that are taxing high cannot generate sufficient revenues to meet even 
minimum standards. There must be a direct and close correlation between a 
district's tax effort and the educational resources available to it; in other 
words, districts must have substantially equal access to similar revenues per 
pupil at similar levels of tax effort. Children who live in poor districts and 
children who live in rich districts must be afforded a substantially equal 
opportunity to have access to educational funds. Certainly, this much is 
required if the state is to educate its populace efficiently and provide for a 
general diffusion of knowledge statewide. 
(29)
Because constitutional efficiency does not require absolute equality of 
spending, we expressly acknowledged that "local communities would [not] be 
precluded from supplementing an efficient system established by the 
legislature", but we added that "any local enrichment must derive solely from 
local tax effort." 
(30) In other words, the constitutional standard of efficiency 
requires substantially equivalent access to revenue only up to a point, after 
which a local community can elect higher taxes to "supplement" and "enrich" its 
own schools. That point, of course, although we did not expressly say so in 
Edgewood I, is the achievement of an adequate school system as 
required by the Constitution. Once the Legislature has discharged its duty to 
provide an adequate school system for the State, a local district is free to 
provide enhanced public education opportunities if its residents vote to tax 
themselves at higher levels. The requirement of efficiency does not preclude 
local supplementation of schools. Although we were not called upon in 
Edgewood I to consider what constitutional adequacy entails, the 
interrelationship between the standards of adequacy and efficiency was 
fundamental to our reasoning in that case.
We ordered that state funding of public schools cease on May 1, 1990, unless 
the Legislature conformed the system to meet constitutional standards. 
(31) Although we expressly did not "instruct the legislature as to the 
specifics of the legislation it should enact . . . or order it to 
raise taxes," 
(32) we cautioned that "[a] band-aid will not suffice; the system 
itself must be changed." 
(33) Eight months later, in a sixth special session, the Legislature 
adjusted the system to provide incentives it believed would "achieve substantial 
equity among the districts that educate 95% of our students." 
(34) The plaintiffs in Edgewood I immediately challenged 
this legislation, Senate Bill 1, again on the ground that the system was not 
efficient within the meaning of article VII, section 1 of the Constitution. 
Without attempting to determine whether the incentives added by Senate Bill 1 
could realistically reach their goals, we concluded in Edgewood II 
that the system as a whole remained constitutionally inefficient:
Even if the approach of Senate Bill 1 produces a 
more equitable utilization of state educational dollars, it does not remedy the 
major causes of the wide opportunity gaps between rich and poor districts. It 
does not change the boundaries of any of the current 1052 school districts, the 
wealthiest of which continues to draw funds from a tax base roughly 450 times 
greater per weighted pupil than the poorest district. It does not change the 
basic funding allocation, with approximately half of all education funds coming 
from local property taxes rather than state revenue. And it makes no attempt to 
equalize access to funds among all districts. By limiting the funding formula to 
districts in which 95% of the students attend school, the Legislature excluded 
132 districts which educate approximately 170,000 students and harbor about 15% 
of the property wealth in the state. A third of our students attend school in 
the poorest districts which also have about 15% of the property wealth in the 
state. Consequently, after Senate Bill 1, the 170,000 students in the wealthiest 
districts are still supported by local revenues drawn from the same tax base as 
the 1,000,000 students in the poorest districts.
These factors compel the conclusion as a matter of 
law that the State has made an unconstitutionally inefficient use of its 
resources. The fundamental flaw of Senate Bill 1 lies not in any particular 
provisions but in its overall failure to restructure the system. 
(35)
We reaffirmed that efficiency did not preclude local supplementation of 
school funding. 
(36) On rehearing, we stressed:
The current system remains unconstitutional not 
because any unequalized local supplementation is employed, but because 
the State relies so heavily on unequalized local funding in attempting to 
discharge its duty to "make suitable provision for the support and maintenance 
of an efficient system of public free schools." Once the Legislature provides an 
efficient system in compliance with article VII, section 1, it may, so long as 
efficiency is maintained, authorize local school districts to supplement their 
educational resources if local property owners approve an additional local 
property tax. 
(37)
Because the Legislature was then in session, we required that it respond 
without delay, and it promptly enacted Senate Bill 351. 
(38) The legislation created 188 new "county education districts". In 
most instances, a CED comprised the school districts in a single county. 
(39) The sole purpose of the CEDs was to levy, collect, and distribute 
property taxes among their component school districts, respectively, in effect 
consolidating school districts' tax bases while leaving them in control of their 
own schools. 
(40) CED tax rates and distributions were prescribed by statute to 
ensure uniformity. This state-controlled tax-base consolidation "reduced the 
geographical disparities in the availability of revenue for education" 
(41) and was not challenged as failing to satisfy the efficiency 
standard of article VII, section 1. It was, however, challenged as imposing a 
state ad valorem tax in violation of article VIII, section 1-e of the 
Constitution. We sustained that challenge in Edgewood III:
Senate Bill 351 mandates the tax CEDs levy. No CED 
may decline to levy the tax. The tax rate for all CEDs is predetermined by 
Senate Bill 351. No CED can tax at a higher rate or a lower rate under any 
circumstances. Indeed, the very purpose of the CEDs is to levy a uniform tax 
statewide. The distribution of the proceeds is set by Senate Bill 351. No CED 
has any discretion to distribute tax proceeds in any manner except as required 
by statute. Every function of the CEDs is purely ministerial. If the State 
mandates that a tax be levied, sets the rate, and prescribes the distribution of 
the proceeds, the tax is a state tax, regardless of the instrumentality which 
the State may choose to use. 
(42)
To place the situation created by Senate Bill 351 in the broader context of 
the constitutional prohibition of state ad valorem tax, we explained:
An ad valorem tax is a state tax when it is imposed 
directly by the State or when the State so completely controls the levy, 
assessment and disbursement of revenue, either directly or indirectly, that the 
authority employed is without meaningful discretion. How far the State can go 
toward encouraging a local taxing authority to levy an ad valorem tax before the 
tax becomes a state tax is difficult to delineate. Clearly, if the State merely 
authorized a tax but left the decision whether to levy it entirely up to local 
authorities, to be approved by the voters if necessary, then the tax would not 
be a state tax. The local authority could freely choose whether to levy the tax 
or not. To the other extreme, if the State mandates the levy of a tax at a set 
rate and prescribes the distribution of the proceeds, the tax is a state tax, 
irrespective of whether the State acts in its own behalf or through an 
intermediary. Between these two extremes lies a spectrum of other possibilities. 
If the State required local authorities to levy an ad valorem tax but allowed 
them discretion on setting the rate and disbursing the proceeds, the State's 
conduct might not violate article VIII, section 1-e. It is difficult, perhaps 
impossible, to define for every conceivable hypothetical precisely where along 
this continuum such taxes become state taxes. Therefore, if the Legislature, in 
an effort to remedy Senate Bill 351 with as few changes as possible, chose to 
inject some additional element of leeway in the assessment of the CED tax, it is 
impossible to say in advance whether that element would remove the tax from the 
prohibition of article VIII, section 1-e. Each case must necessarily turn on its 
own particulars. Although parsing the differences may be likened to dancing on 
the head of a pin, it is the Legislature which has created the pin, summoned the 
dancers, and called the tune. The Legislature can avoid these constitutional 
conundra by choosing another path altogether. 
(43)
We also held that by levying a tax without an election, the CEDs violated 
article VII, section 3(e) of the Constitution. 
(44)
We delayed enforcement of our ruling for more than a year, until the end of 
the next regular session of the Legislature in 1993. 
(45) During that session, the Legislature's first reaction was to 
attempt to amend the Constitution. A proposed amendment that would have 
rewritten article VII, section 1 to remove its standards and commit the 
responsibility for public education to local school districts was introduced but 
not reported out of committee. 
(46) A proposed amendment that would have authorized the system 
structured by Senate Bill 351 passed the Senate and narrowly passed the House 
(47) but was soundly defeated by the people before the session 
ended. 
(48) The Legislature then enacted Senate Bill 7. 
(49)
Senate Bill 7 returned to the two-tiered Foundation School Program, 
(50) the basic structure of which remains in place today. 
(51) As before, "[t]he stated purpose of Tier 1 is to guarantee 
'sufficient financing for all school districts to provide a basic program of 
education that meets accreditation and other legal standards.'" 
(52) At a minimum $0.86 tax rate, a school district that cannot 
generate revenue equal to a "basic allotment" per student in WADA -- in 1993, 
$2,300, 
(53) and today, $2,537, 
(54) subject to various adjustments 
(55) -- receives state funds for the difference. 
(56) As before, the basic allotment does not cover the cost of an 
education that meets legislated accrediting standards. 
(57) Tier 2 provides for partially state-supported local 
supplementation. 
(58) For each penny a district raises the tax rate above the minimum, 
the state guarantees a certain yield per weighted student -- $20.55 in 1993, 
(59) and $27.14 today. 
(60) The tax rate for maintenance and operations continues to be 
capped at $1.50, subject to various adjustments and exceptions. 
(61) There is also some state funding for facilities, sometimes 
referred to as Tier 3 in the system. 
(62)
The major change that Senate Bill 7 made in the Foundation School Program was 
to equalize school districts' "wealth per student" -- a district's taxable 
property value divided by the number of students in WADA. 
(63) A school district with wealth per student greater than a certain 
amount -- $280,000 in 1993, 
(64) and $305,000 today 
(65) -- must transfer the excess, or the tax revenue generated from 
it, either actually or effectively, so as to provide funding for school 
districts with less wealth. 
(66) The local tax revenue "recaptured" and redistributed by this 
mechanism amounted to almost $1 billion in 2000. 
(67) This taxable wealth equalization scheme, dubbed by some "Robin 
Hood", eliminates the geographical disparities in available revenue among school 
districts that characterized the pre-1993 version of the Foundation School 
Program.
The public school finance system set up by Senate Bill 7 was challenged on 
numerous grounds, all of which we rejected in Edgewood IV. Two are 
important for purposes of the present case. We held that the unequalized funding 
available for local supplementation did not render the system constitutionally 
inefficient:
It is apparent from the Court's opinions that we 
have recognized that an efficient system does not require equality of access to 
revenue at all levels. Otherwise, unequalized local supplementation, which we 
expressly approved in Edgewood II, could never be justified. 
Article VII, section 1 of the Constitution and our previous Edgewood 
decisions mandate that efficiency be measured against both qualitative and 
financial standards.
The district court viewed efficiency as synonymous 
with equity, meaning that districts must have substantially equal revenue for 
substantially equal tax effort at all levels of funding. This 
interpretation ignores our holding in Edgewood II that unequalized 
local supplementation is not constitutionally prohibited. The effect of this 
"equity at all levels" theory of efficiency is to "level-down" the quality of 
our public school system, a consequence which is universally regarded as 
undesirable from an educational perspective. Under this theory, it would be 
constitutional for the Legislature to limit all districts to a funding level of 
$500 per student as long as there was equal access to this $500 per student, 
even if $3500 per student were required for a general diffusion of 
knowledge. Neither the Constitution nor our previous Edgewood decisions 
warrant such an interpretation. 
(68)
Constitutional efficiency under article VII, section 1 requires only that 
"districts must have substantially equal access to funding up to the 
legislatively defined level that achieves the constitutional mandate of a 
general diffusion of knowledge." 
(69) That legislatively defined level was an accredited education:
In Senate Bill 7, the Legislature equates the 
provision of a "general diffusion of knowledge" with the provision of an 
accredited education. The accountability regime set forth in [the statute], we 
conclude, meets the Legislature's constitutional obligation to provide for a 
general diffusion of knowledge statewide. 
(70)
We cautioned, however, that the Constitution does not give the Legislature a 
completely free hand in determining what level of education will achieve the 
general diffusion of knowledge required by article VII, section 1:
As long as the Legislature establishes a suitable 
regime that provides for a general diffusion of knowledge, the Legislature may 
decide whether the regime should be administered by a state agency, by the 
districts themselves, or by any other means.
This is not to say that the Legislature may define 
what constitutes a general diffusion of knowledge so low as to avoid its 
obligation to make suitable provision imposed by article VII, section 1. While 
the Legislature certainly has broad discretion to make the myriad policy 
decisions concerning education, that discretion is not without bounds. 
(71)
The interrelated constitutional standards of efficiency and adequacy both 
limit legislative discretion:
As long as efficiency is maintained, it is not 
unconstitutional for districts to supplement their programs with local 
funds, even if such funds are unmatched by state dollars and even 
if such funds are not subject to statewide recapture. We caution, however, 
that the amount of "supplementation" in the system cannot become so great that 
it, in effect, destroys the efficiency of the entire system. The danger is that 
what the Legislature today considers to be "supplementation" may tomorrow become 
necessary to satisfy the constitutional mandate for a general diffusion of 
knowledge. 
(72)
"This is simply another way of saying that the State's provision for a 
general diffusion of knowledge must reflect changing times, needs, and public 
expectations." 
(73)
In Edgewood IV, we also held that Senate Bill 7 did not impose 
a state ad valorem tax in violation of article VIII, section 1-e of the 
Constitution simply because a number of school districts were already taxing at 
the maximum $1.50 rate. Some districts were taxing below the minimum $0.86 rate, 
and it appeared that for the most part "[p]roperty-poor and property-rich 
districts presently can attain the revenue necessary to provide suitably for a 
general diffusion of knowledge at tax rates of approximately $1.31 and $1.22, 
respectively." 
(74) We acknowledged, however, that over time more districts would be 
required to tax at the maximum $1.50 rate:
if the cost of providing for a general diffusion of 
knowledge continues to rise, as it surely will, the minimum rate at which a 
district must tax will also rise. Eventually, some districts may be forced to 
tax at the maximum allowable rate just to provide a general diffusion of 
knowledge. If a cap on tax rates were to become in effect a floor as well as a 
ceiling, the conclusion that the Legislature had set a statewide ad valorem tax 
would appear to be unavoidable because the districts would then have lost all 
meaningful discretion in setting the tax rate. 
(75)
Although we rejected all of the challenges to Senate Bill 7, we stressed that 
the system was "minimally acceptable only when viewed through the prism of 
history." 
(76) In other words, it was better than it had been. But we added: 
"Surely Texas can and must do better." 
(77) In every session since 1993, the Legislature has amended the 
Education Code, 
(78) but little change has been made in funding the maintenance and 
operation of public schools. As noted, the Tier 1 basic allotments, the Tier 2 
guaranteed yields, and the equalization threshold have all been increased, 
thereby providing more state funds for public education, but the structure of 
the system remains essentially the same. Meanwhile, the level of state funding 
has continued to fall, reliance on local property taxes has increased, 
(79) and more school districts -- now 39% with 32% of the State's 4.1 
million students, according to petitioners' calculations from data furnished by 
the Texas Comptroller -- have reached maximum tax rates.
Presciently, we observed in Edgewood IV: "Our judgment in this 
case should not be interpreted as a signal that the school finance crisis in 
Texas has ended." 
(80)

II

In the case now before us, filed in April 2001, four school districts 
(81) assert that the public school finance system has come to involve 
a state ad valorem tax in violation of article VIII, section 1-e, just as we 
foresaw it might in Edgewood IV. 
(82) Specifically, after quoting our admonition from 
Edgewood IV, the plaintiffs alleged:
In the six years since the 1995 
Edgewood IV decision, education costs have continued to rise. As 
predicted in Edgewood IV, school districts, such as the 
Plaintiffs, are required to tax at or near the maximum allowable $1.50 M&O 
[maintenance and operation] tax rate in order to educate students in their 
districts. Such school districts have lost all meaningful discretion in 
setting their M&O tax rate. Accordingly, as contemplated by the Supreme 
Court in Edgewood IV, the statutory cap on the M&O tax rate 
has become a statewide ad valorem tax in violation of the Texas Constitution. 
Without relief from the statutory cap on M&O tax rates, the Plaintiff school 
districts must continue to take such measures as cutting programs, eliminating 
teaching positions and/or increasing class size.
(Emphasis added.) Plaintiffs prayed for a judgment declaring the $1.50 
statutory cap to be a constitutionally prohibited state ad valorem tax.
The defendants 
(83) (collectively, "the State") answered with a plea to the 
jurisdiction, plea in abatement, and special exceptions, asserting that the 
action was not ripe and should be dismissed. Specifically, the State 
asserted:
• "the system would not result in a statewide ad valorem tax unless and until 
the 'cap on tax rates were to become in effect a floor as well as a ceiling' 
[quoting Edgewood IV, 917 S.W.2d at 738] as to all 
districts" (emphasis added), and plaintiffs do not and cannot allege that 
this is the situation;
• "Plaintiffs do not allege that the system requires them or any other 
district to tax at the rate of $1.50 in order to provide a general diffusion 
of knowledge" (emphasis in original) as they must to allege a 
constitutional violation, "but instead allege only that they must tax at (or 
near) $1.50 'in order to educate students in their districts"; and
• because "each of the Plaintiff districts . . . has voluntarily 
elected to grant an optional twenty percent homestead exemption . . . 
they cannot plead or prove that the State system forces them to tax at 
$1.50 just to provide an accredited education."
The State's ripeness and pleading arguments were thus related: in the State's 
view, the claims the plaintiffs were required to plead in order to state the 
constitutional violation they asserted were not ripe.
In response, the plaintiffs argued that:
• to show a state property tax they were required to prove only that 
some, not all, school districts were forced to tax at maximum 
rates;
• although the defendants contended that an accredited education could be 
provided for $4,179 per student, plaintiffs were entitled to explore the factual 
basis for that figure and to show that taxation at maximum rates was required to 
provide an accredited education; and
• homestead exemptions should not be taken into account in determining 
whether school districts were being forced to tax at maximum rates.
The plaintiffs contended that their pleadings were sufficient and stated 
claims that were ripe.
Two groups of school districts intervened. While they opposed the plaintiffs' 
claims, they alleged that the public school finance system remained flawed for 
other reasons. The six Edgewood intervenors 
(84) asserted:
The Edgewood Intervenors are Defendant Intervenors 
to the extent that they agree that this case should be dismissed for lack of 
ripeness and, therefore, lack of subject matter jurisdiction. On the other hand, 
Edgewood Intervenors are Cross-Plaintiff Intervenors to the extent that they 
agree that the Texas School Finance System at $1.50 does not provide sufficient 
funding or equitable funding to guarantee a general diffusion of knowledge.
The thirty-four Alvarado intervenors 
(85) asserted: "In spite of the fact that progress is being made, 
Intervenors do not concede that the funding levels for Tier 2 districts set by 
the legislature achieves an adequate level of funding for public schools in 
Texas." They added that "the state is not contributing its fair share of monies 
needed to maintain an adequate school finance system." Regarding the plaintiffs' 
claims, they agreed with the defendants that they should be dismissed:
Intervenors view Plaintiffs' case as a pure 
adequacy claim. As stated above, the $1.50 tax rate cap never becomes a factor 
unless total revenues available to school districts are inadequate to provide 
for a general diffusion of knowledge. Intervenors believe that the maintenance 
of an equitable system is the best way to insure adequacy.
The Alvarado intervenors specially excepted to the plaintiffs' pleading for 
alleging only that they were required to tax at maximum rates "to educate their 
students" rather than "to provide the constitutionally-required general 
diffusion of knowledge to their students." The plaintiffs responded:
This special exception mischaracterizes Plaintiffs' 
pleading and constitutes unnecessary hairsplitting over semantics. [Plaintiffs 
quoted from Edgewood IV and] then made clear that their cause of 
action was based on the [quoted] language, and that they are required to tax "at 
or near the $1.50 M&O tax rate in order to educate students in their 
districts", i.e., to provide a general diffusion of knowledge. Because the 
"floor" described by the Court [in Edgewood IV] is linked to the 
"general diffusion of knowledge" standard, Plaintiffs were implicitly (if not 
explicitly) alleging that they had to tax at or near $1.50 just to provide their 
students with a general diffusion of knowledge.
Ten weeks after the case was filed, the trial court conducted a hearing on 
the dilatory pleas and the special exceptions. The defendants argued, and the 
trial court agreed, that this Court's admonition in Edgewood IV 
that the finance system could result in a state property tax was dicta. 
(86) The plaintiffs argued, however, that this Court had described 
circumstances that could violate the constitutional prohibition of a state ad 
valorem tax, and that they were entitled to prove that those circumstances had 
come into existence. Regarding the plaintiffs' pleadings, the following colloquy 
occurred:
THE COURT: Well, let me ask counsel for the 
plaintiffs: are you . . . pleading that . . . you can't 
provide an accredited system on $1.50 or are you pleading that the accredited 
system isn't good enough to provide a general diffusion of knowledge and you 
can't provide a general diffusion of knowledge on $1.50?
COUNSEL: All of the above. All the above. 
. . . And again, we're involved in notice pleading. We pled it. It's 
pretty clear what we're driving at. We're driving at page 738 of the 
Edgewood [IV] majority opinion.
The trial court did not hear evidence but did take judicial notice of state 
appropriations and school district tax levies.
Less than a month later, the trial court issued an order dismissing the case. 
The court explained in the order:
Whether the Legislature has imposed a 
state ad valorem tax is decided by reference to how the public school 
finance system works throughout the state, not by reference to how the system 
works in any one district. Moreover, to look at the question district by 
district would mean that the tax could be constitutional in one district and 
unconstitutional in another. Thus, the court must assess the system as a 
whole.

* * *

Remember that the constitutional question is not 
how many districts are at the cap, but how many districts must 
be at the cap to provide an accredited education. The court today is merely 
holding that a plaintiff must be able to plead that some significant number of 
districts are at the cap to go forward with a claim that too many 
districts must be at the cap. Naturally, the court has assumed on 
special exceptions that if a district is at the cap, the district must be at the 
cap. This pleading assumption builds in a significant margin of error in favor 
of the plaintiff districts.
The margin of error is in favor of the plaintiff 
districts because, on the merits, the plaintiffs must show that the 
highly-acclaimed school districts taxing at $1.50 would plummet to 
academically-unacceptable school districts at $1.49.

* * *

Though Edgewood IV provides limited 
guidance on how many districts must have to tax at the cap to be 
constitutionally significant, or, in other words, for the court to conclude that 
the districts have lost "meaningful discretion" in levying the ad valorem tax, 
based upon what the Supreme Court does teach, this court holds that for the 
approved tax to become a prohibited state ad valorem tax, some 
significant number of districts across the state must have to tax at the $1.50 
cap in order to provide an accredited education. For the legislative design to 
be an unconstitutional state ad valorem tax, the design must require a 
significant number of districts to tax at the cap, something approaching or 
exceeding half the districts.
Thus, a single number decides the case on special 
exceptions -- the percentage of districts that are at the cap of $1.50. The 
plaintiffs do not and cannot state a claim upon which relief can be granted 
because a constitutionally insignificant number of districts are at the cap of 
$1.50. Only 19% of the school districts even tax at the cap of $1.50, which 
means that 81% do not. Indeed, two of the plaintiff districts do not tax at the 
$1.50 rate. Moreover, many districts, including all four plaintiffs, have 
granted local-option tax exemptions. Only 12% of the school districts tax at the 
cap of $1.50 without a local-option exemption, which means that 88% do not.
Of course, the decision to grant a local-option 
exemption in and of itself is the exercise of meaningful local discretion. By 
granting a local-option exemption, for whatever worthy reason, a school district 
takes a great amount of taxable wealth out of the system. . . . The 
court is not implying that these exemptions are not appropriate; the court is 
merely saying that they have the same effect as substantially lowering the tax 
rate. As long as a district has an exemption, therefore, it is not at the tax 
cap.
The court dismissed with prejudice the plaintiffs' allegation of an existing 
violation of article VIII, section 1-e, and dismissed without prejudice the 
plaintiffs' allegation that a violation was imminent.
The court of appeals affirmed, 
(87) but not for the reasons given by the trial court. Although the 
court of appeals considered the pleading and ripeness issues separately, it 
recognized that the parties' arguments on both issues are related. In the court 
of appeals' view, the number of school districts taxing at maximum rates was 
irrelevant. "Whether the effect of the tax is experienced 'statewide' 
or by a majority of districts in the state does not determine whether a tax is a 
state tax." 
(88) Rather, the court said, "the controlling factor in reviewing a 
challenge to an alleged ad valorem tax is the State's involvement in the 
levy." 
(89) "Seen in this light," the court said, "the positions taken by the 
district court . . . and by the parties in their briefs, are based on 
a misunderstanding of the determinative factors of a state ad valorem tax." 
(90)
Regarding the plaintiffs' pleadings, the court explained:
In determining the State's control over the 
maintenance and operations property tax, the relevant inquiry is the 
relationship between the tax and the districts' obligations to provide an 
accredited education. As the court found in Edgewood IV, the 
system may encourage districts to tax at or near the maximum rate. Whether it 
does so is irrelevant for purposes of determining whether the system imposes a 
state tax. But if the districts' abilities to fulfill a state mandate, here the 
obligation to provide the minimum accredited education, forced the districts to 
tax at the maximum rate, the system might approach an unacceptable level of 
state control over the levy. Therefore, the allegation that a district is forced 
to tax at the highest allowable rate to provide the bare, accredited education 
is a necessary element of a cause of action brought by a district challenging 
the cap. 
(91)
The court concluded that the plaintiffs had failed to make this 
allegation:
West Orange-Cove instead pleaded that it was forced 
to tax at or near $1.50 to "educate its students." The enriched education that 
West Orange Cove locally desires to provide its students is not the measure for 
determining if the State is imposing an educational mandate that requires the 
local district to levy a state-imposed rate of tax. West Orange-Cove's pleadings 
simply fail to state a viable cause of action. 
(92)
Because the plaintiffs'
allegation does not refer to the districts' 
state-imposed obligation to provide an accredited education 
. . . , the districts' pleadings fail to state a challenge to the 
tax as a state tax. Accordingly, we hold that the trial court properly 
dismissed the claim for failure to state a cause of action. 
(93)
The court also held that the plaintiffs' claim that taxation at maximum rates 
was necessary to achieve the constitutional standard of "a general diffusion of 
knowledge" was nonjusticiable:
As the record makes clear, West Orange-Cove wants 
to use this opportunity, framed as a tax challenge, to engage the judiciary in a 
debate over policy choices that are within the province of the legislative 
branch. Both the Legislature and the supreme court have equated the term 
"general diffusion of knowledge" with accreditation standards. The court, in 
addition, has insisted that the judiciary has a limited role in the area of 
educational policy and should defer to the Legislature on matters involving 
educational standards and funding . . . [citing 
Edgewood IV, 917 S.W.2d at 726]. West Orange-Cove's claim would 
involve the courts in deciding what is meant by the term "general diffusion of 
knowledge" without reference to the accreditation standards set by the 
Legislature. That body, however, has conclusively equated the two concepts, 
thereby foreclosing the judicial inquiry West Orange-Cove seeks to pursue. 
Moreover, as the supreme court has recognized, the meaning of a "general 
diffusion of knowledge" and the development of appropriate accreditation 
standards are policy choices best suited to the legislature. Id. 
(94)
Summarizing its holdings, the court of appeals stated:
The instant case is not unripe because fewer than 
half of all school districts are taxing at the maximum rate; rather, the claim 
is unripe because the appellants have failed to demonstrate that they are forced 
to set their rates of tax at the maximum allowable rate just to provide an 
accredited education. That is, the districts have not pleaded that they have 
lost all meaningful discretion in setting the rate of tax as it pertains to 
their ability to meet a state-imposed obligation, which is the only relevant 
concern in this lawsuit. 
(95)
We granted the plaintiffs' petition for review and expedited oral argument. 
(96)

III

We consider first what the plaintiffs must allege to state a violation of 
article VIII, section 1-e, and then whether the plaintiffs can and do make that 
allegation.

A

We adhere to the rule stated in Edgewood III that "[a]n ad 
valorem tax is a state tax when it is imposed directly by the State or when the 
State so completely controls the levy, assessment and disbursement of revenue, 
either directly or indirectly, that the authority employed is without meaningful 
discretion." 
(97) The determining factor is the extent of the State's control over 
the taxation process.
The State argues that local school district property taxes cannot be a state 
tax unless every district is forced to tax at a specific rate, here, 
the maximum $1.50 rate for maintenance and operation (subject to adjustments). 
The trial court rejected this argument but held that there can be no state tax 
unless most districts are forced to tax at maximum rates. Both 
positions presuppose that the issue is the extent of the tax and that the 
determination must be made from the perspective of the system as a whole rather 
than with respect to each district. As the trial court stated: "Whether the 
Legislature has imposed a state ad valorem tax is decided by reference 
to how the public school finance system works throughout the state, not by 
reference to how the system works in any one district." This premise has no 
support in the constitutional text or the rule we have stated for applying it. 
The Constitution prohibits "State ad valorem taxes . . . upon 
any property within this State" (emphasis added) and is not limited to 
statewide ad valorem taxes. The provision expressly contemplates that a 
state ad valorem tax could be levied on only some property. The 
prohibition does not permit the State to set rates for hospital districts, or 
junior college districts, or mosquito control districts, or fire prevention 
districts, or noxious weed control districts -- to name but a few of the many 
taxing authorities 
(98) -- just because such districts are confined to a few areas of the 
State, nor does the Constitution permit the State to control the tax rate for 
even one such district. Were it otherwise, then as we observed in 
Edgewood III:
The State could create County Highway Districts, or County Prison Districts, 
or all-purpose County Funding Districts to levy taxes at set rates for 
prescribed purposes, and by such means accomplish what it could not do itself. 
(99)
The concern is not the pervasiveness of the tax but the State's control of 
it. A state ad valorem tax is just that -- one imposed by the State, whether it 
acts directly or through control of another entity, and whether the tax falls on 
the entire population or only a few.
Thus, a single district states a claim under article VIII, section 1-e if it 
alleges that it is constrained by the State to tax at a particular rate. How a 
constitutional violation in one or a few school districts would impact the 
public school finance system as a whole is not before us.

B

The State argues that for four reasons the plaintiffs cannot allege that they 
are forced to tax at maximum rates. To sustain the dismissal of the plaintiffs' 
case on the pleadings, however, the State must establish the plaintiffs' 
inability to plead a constitutional violation as a matter of law. 
(100) We examine each of the State's reasons in turn.

1

The State asserts that it exerts no control over taxation by local school 
districts and that the districts are free to tax at any levels they choose up to 
the maximum. The State's argument runs as follows. The duty to provide an 
adequate public education belongs to the Legislature, not local school 
districts. School districts are "forced" to do nothing; they choose to 
tax and educate at desired levels. While the State may encourage certain 
choices, it does not compel them.
This argument, in essence, is that nothing short of virtually absolute state 
control of ad valorem taxation violates article VIII, section 1-e. We plainly 
rejected the argument in Edgewood III:
How far the State can go toward encouraging a local 
taxing authority to levy an ad valorem tax before the tax becomes a state tax is 
difficult to delineate. Clearly, if the State merely authorized a tax but left 
the decision whether to levy it entirely up to local authorities, to be approved 
by the voters if necessary, then the tax would not be a state tax. The local 
authority could freely choose whether to levy the tax or not. To the other 
extreme, if the State mandates the levy of a tax at a set rate and prescribes 
the distribution of the proceeds, the tax is a state tax, irrespective of 
whether the State acts in its own behalf or through an intermediary. Between 
these two extremes lies a spectrum of other possibilities. If the State required 
local authorities to levy an ad valorem tax but allowed them discretion on 
setting the rate and disbursing the proceeds, the State's conduct might not 
violate article VIII, section 1-e. It is difficult, perhaps impossible, to 
define for every conceivable hypothetical precisely where along this continuum 
such taxes become state taxes. 
(101)
Certainly, the State does not now control taxation by school districts to the 
same extent it controlled taxation by the CEDs. But as we have said, the 
constitutional prohibition is violated whenever state control denies a taxing 
authority "meaningful discretion". 
(102)
The Legislature has deprived school districts of any meaningful discretion to 
provide an inadequate education, as indeed it is constitutionally bound to do. 
The Legislature's duty under article VII, section 1 is to make suitable 
provision for a general diffusion of knowledge through free public schools. "As 
long as the Legislature establishes a suitable regime that provides for a 
general diffusion of knowledge, the Legislature may decide whether the regime 
should be administered by a state agency, by the districts themselves, or by any 
other means." 
(103) "Certainly, if the Legislature substantially defaulted on its 
responsibility such that Texas school children were denied access to that 
education needed to participate fully in the social, economic, and educational 
opportunities available in Texas, the 'suitable provision' clause [of article 
VII, section 1] would be violated." 
(104) "In Edgewood I, we reaffirmed that the requirement 
of suitability is a judicially-enforceable mandate . . . ." 
(105) A public school system dependent on local districts free to 
choose not to provide an adequate education would in no way be suitable. In 
fact, the Legislature has acted to ensure that that is not the system. 
Chapter 39 of the Education Code, entitled "Public School System 
Accountability", sets school accreditation standards, 
(106) rewards achievement of these standards, 
(107) and imposes sanctions for non-compliance ranging from 
admonitions to closure of the district. 
(108) These provisions are legislated requirements that school 
districts provide an adequate education, and they leave no meaningful discretion 
for districts to do otherwise.
We also rejected the position for which the State now argues in 
Edgewood IV, expressly recognizing that school districts could 
indeed be "forced" -- our word -- by increasing costs "to tax at the maximum 
allowable rate just to provide a general diffusion of knowledge." 
(109) The "ceiling", we said, could become a "floor" as well, in which 
event "the conclusion that the Legislature had set a statewide ad valorem tax 
would appear to be unavoidable because the districts would then have lost all 
meaningful discretion in setting the tax rate." 
(110) The State successfully argued to the trial court that these 
statements were dicta, 
(111) but they were an important part of our rationale. 
(112) We held in Edgewood IV that local ad valorem taxes 
were not state ad valorem taxes because of then-existing circumstances that 
allowed school districts meaningful discretion in setting tax rates, and we 
expressly acknowledged that those circumstances could, and probably would, 
change. That distinction defined the reach of the Court's decision in the case. 
Had we thought that local school district property taxes could never violate 
article VIII, section 1-e, our decision would certainly have been far 
easier.
We remain of the view that school districts can be forced by the current 
system to tax at maximum rates. An allegation that this has occurred states a 
claim under article VIII, section 1-e.

2

Alternatively, the State argues that its only requirement of school districts 
is that they provide an accredited education as defined by the Legislature, and 
that the plaintiffs cannot allege in good faith that any district is forced to 
tax at the maximum rate just to meet this requirement. On the contrary, the 
State says, school districts taxing at maximum rates do so to provide enhanced 
educational opportunities and not merely to maintain accreditation. The court of 
appeals appears to have agreed with this argument.
Again, the State's argument suffers a flawed premise. Accreditation standards 
are not the only requirements the State imposes on school districts. As we have 
just explained, because the State has chosen to rely heavily on school districts 
to discharge its duty to provide a constitutionally adequate education -- that 
is, "[a] general diffusion of knowledge . . . essential to the 
preservation of the liberties and rights of the people" 
(113) -- the State must require that school districts achieve this 
goal; otherwise, the public school system is not suitable for its purpose. 
Consistent with its constitutional duty, the Legislature has stated:
The mission of the public education system of this 
state is to ensure that all Texas children have access to a quality education 
that enables them to achieve their potential and fully participate now and in 
the future in the social, economic, and educational opportunities of our state 
and nation. That mission is grounded on the conviction that a general diffusion 
of knowledge is essential for the welfare of this state and for the preservation 
of the liberties and rights of citizens. 
(114)
We acknowledged in Edgewood IV that the Legislature in 1993 
equated an accredited education with a general diffusion of knowledge and 
discharged its duty to provide for the latter by demanding accountability of 
school districts. 
(115) But we also insisted that the "State's provision for a general 
diffusion of knowledge must reflect changing times, needs, and public 
expectations", 
(116) and that the Legislature is not the sole arbiter of the 
constitutional standard. 
(117) The public school system the Legislature has established 
requires that school districts provide both an accredited education and a 
general diffusion of knowledge. It may well be that the requirements are 
identical; indeed, as in Edgewood IV, we presume they are, giving 
deference to the Legislature's choices. But it is possible for them not to be -- 
an accredited education may provide more than a general diffusion of knowledge, 
or vice versa -- and because both are binding, a district may allege that 
taxation at a maximum rate in order to satisfy either is a state ad valorem 
tax.
The court of appeals concluded that to "involve the courts in deciding what 
is meant by the term 'general diffusion of knowledge' without reference to the 
accreditation standards set by the Legislature" would "engage the judiciary in a 
debate over policy choices that are within the province of the legislative 
branch." 
(118) We agree, as we have already explained, that it is outside the 
scope of judicial authority to review the Legislature's policy choices in 
determining what constitutes an adequate education, and we emphasize that the 
courts cannot undertake to review those choices one by one or attempt to define 
in detail an adequate education. But once policy choices have been made by the 
Legislature, it is the judiciary's responsibility in a proper case to determine 
whether those choices as a whole meet the standard set by the people in article 
VII, section 1.
Even if the plaintiffs' claims were limited to taxing to provide an 
accredited education, there is no factual record for determining what the cost 
of an accredited education is. The plaintiffs urged in the trial court that they 
were entitled to discover the State's evaluation of that cost and to present 
evidence that the true cost is greater. For the trial court, this factual 
dispute was irrelevant, given its view that the plaintiffs could not allege a 
constitutional violation because they could not allege that half or close to 
half of all school districts were taxing at maximum rates. But since we have 
concluded, as the court of appeals did, that the number of districts taxing at 
maximum rates is not determinative of the plaintiffs' claims, the subsisting 
dispute over the cost of an accredited education precludes dismissal of the case 
on the pleadings.
Thus, to obtain dismissal of the plaintiffs' claims on the merits based 
solely on the pleadings, the State must establish as a matter of law that the 
plaintiff school districts are not forced to tax at maximum rates either to meet 
accreditation standards or to provide a general diffusion of knowledge. The 
State has done neither.

3

The Legislature has granted a partial homestead exemption from school 
district taxation, 
(119) which a district may increase up to a certain amount at its 
option, 
(120) as many districts do. The State argues that no school district 
that has opted for an increased homestead exemption can allege that it is forced 
to tax at maximum rates because it has meaningful discretion to deny the 
increased exemption and tax at a lower rate. The trial court agreed with this 
argument, and the court of appeals did not address it.
We reiterate that to obtain dismissal of the plaintiffs' action based solely 
on the pleadings, the State must establish that the mere existence of 
local-option exemptions precludes as a matter of law the allegation that school 
districts are forced to tax at maximum rates. The State has not met this burden. 
For one thing, the plaintiffs may be able to show that even without granting 
additional homestead exemptions, they could not provide an accredited education 
or a general diffusion of knowledge. For another thing, while school districts 
obviously have discretion whether to increase homestead exemptions, it is far 
from obvious that their discretion is meaningful. By authorizing local-option 
homestead exemptions, knowing that some constituencies will insist on them, the 
Legislature may actually have increased the pressure on school districts to tax 
at maximum rates. In any event, the plaintiffs are entitled to attempt to show 
that homestead exemptions do not afford them meaningful discretion.

4

Finally, the State argues that the plaintiffs cannot allege a violation of 
article VIII, section 1-e unless they tax at the applicable absolute maximum 
rate, not merely near that rate, as apparently only two of the four plaintiffs 
do. This is simply not the case. The constitutional issue remains the extent of 
the State's control. It may be that a school district taxing at $1.47 instead of 
$1.50 has exercised meaningful discretion, but that is not necessarily the case. 
A district taxing a few cents below the maximum rate that can no longer provide 
an accredited education or a general diffusion of knowledge even by raising the 
rate to the maximum need not do so just to prove the point.

C

The last matter is whether the plaintiffs did plead what they must 
to allege a violation of article VIII, section 1-e. The plaintiffs alleged that 
they were required to tax at maximum rates "to educate their students". In 
response to special exceptions, the plaintiffs stated that their allegation was 
tantamount to pleading that taxing at maximum rates was necessary to provide for 
a general diffusion of knowledge. When asked by the trial court whether the 
plaintiffs were pleading that they could not provide an accredited education or 
a general diffusion of knowledge at maximum rates, counsel responded, "All of 
the above." The plaintiffs repeatedly stated that they were pleading that the 
situation we foresaw in Edgewood IV would violate article VIII, 
section 1-e had in fact occurred. No reasonable argument can be made that the 
plaintiffs' pleadings did not put the State on notice of their claims. Of 
course, on special exceptions the trial court has discretion to further clarify 
the issues to be litigated by requiring the plaintiffs to allege specifically, 
for example, whether they are taxing at maximum rates to provide an accredited 
education, or to provide for a general diffusion of knowledge, or both, and 
whether the costs are different.

III

We add a few words in response to the dissent.
First: The dissent would hold that plaintiffs lack standing to sue. While 
"standing, as a component of subject matter jurisdiction, cannot be waived" 
(121) and may thus be raised at any time, the fact that the State has 
not challenged the plaintiffs' standing to sue, nor was the standing of any 
school district challenged in Edgewood I, 
Edgewood II, Edgewood III, or 
Edgewood IV, is some indication of the weakness of the dissent's 
argument. In Nootsie, Ltd. v. Williamson County Appraisal District, we 
held that a county appraisal district had standing to seek a declaratory 
judgment that the Legislature had unconstitutionally defined open-space land for 
tax purposes to include ecological laboratories. 
(122) We see no difference in the standing of an appraisal district to 
assert its claims in Nootsie and the standing of the school districts 
here. The dissent argues that Nootsie is at odds with federal standing 
jurisprudence, but even if it were -- something we need not decide here -- the 
dissent does not explain why any difference between Texas law and federal law is 
reason enough for us not to follow our own recent precedent. The dissent also 
argues that because the plaintiff school districts do not have and do not claim 
to have a constitutional right to meaningful discretion, they have no standing 
to seek a determination that taxation at maximum rates is a constitutionally 
prohibited state ad valorem tax. Again conceding the premise solely for argument 
purposes, we fail to see how the declaration the school districts request in 
this case is any different from the one the appraisal district requested in 
Nootsie. As we explained in Nootsie, the argument that
the district has no inherent vested rights 
protected by the Constitutions of Texas and the United States . . . 
misses the mark because the district does not contend that the statute violates 
constitutional rights belonging to the district. Instead, the district asserts 
an interest because it is charged with implementing a statute that it believes 
violates the Texas Constitution. This interest provides the district with a 
sufficient stake in this controversy . . . that the declaration sought 
will resolve. 
(123)
Finally, the dissent argues that Nootsie can be distinguished 
because there the appraisal district represented aligned interests while here 
the plaintiff school districts represent disparate and conflicting interests. We 
do not understand this distinction. Nootsie allowed an appraisal 
district to challenge the constitutionality of a tax exemption that at least one 
of its taxpayers, Nootsie, Ltd., claimed and others may have opposed. We fail to 
see how the interests of the taxpayers and citizens in the appraisal district in 
Nootsie were any less at odds than the interests of the taxpayers and 
citizens in the plaintiff school districts are here. For the same reasons we 
explained in Nootsie, we hold that the plaintiff school districts in 
this case have standing to assert their claims.
Second: Contrary to the dissent's assertion, we do not hold that school 
districts have a constitutional duty to provide for a general diffusion of 
knowledge. The districts' obligation is imposed by the Legislature, not the 
Constitution, as the passage of our opinion to which the dissent refers 
expressly states -- "[t]he public school system the Legislature has 
established requires that school districts provide both an accredited 
education and a general diffusion of knowledge" (emphasis added) -- and we 
repeat elsewhere and now again here. The Legislature has expressly defined the 
mission of the public school system, including school districts, to accomplish a 
general diffusion of knowledge. 
(124) As we have explained, the Legislature has chosen to make 
suitable provision for a general diffusion of knowledge by using school 
districts, and therefore the State cannot be heard to argue that school 
districts are free to choose not to achieve that goal. If they were, the 
Legislature's use of districts to discharge its constitutional duty would not be 
suitable, since the Legislature would have employed a means that need not 
achieve its end.
Third: The dissent would hold, contrary to Edgewood III and 
Edgewood IV, that a state ad valorem tax is a tax used for a state 
purpose rather than a tax levied by the State. We find nothing in the text or 
history of article VIII, section 1-e to require that a state tax be determined 
by its purpose rather than by the extent of state control over its employment. 
Nor are we clear how such a purpose-oriented standard would operate. In the 
dissent's view, any effort to equalize tax revenues among school districts for 
public education violates article VIII, section 1-e because education is a state 
purpose. This directly contradicts the Court's holdings in 
Edgewood III and Edgewood IV. We do not agree with 
the dissent that the importance of stare decisis can be minimized in 
this area. For fourteen years the Legislature has worked to bring the public 
school finance system into conformity with constitutional requirements as 
declared by this Court. To announce now that we have simply changed our minds on 
matters that have been crucial to the development of the public education system 
would not only threaten havoc to the system, but would, far more importantly, 
undermine the rule of law to which the Court is firmly pledged.
Fourth: The dissent argues that this Court's construction of article VII, 
section 1 since Edgewood I and perhaps dating back to Mumme v. 
Marrs 
(125) necessarily draws the judiciary into making detailed policy 
decisions about the elements of an adequate education. We reiterate that the 
Constitution requires, not that courts make such policy decisions, but that they 
determine, in a proper case, whether the Legislature on the whole has discharged 
its constitutional duty.

* * * * *

For these reasons, we conclude that the lower courts erred in dismissing the 
plaintiffs' action on the pleadings. The judgment of the court of appeals is 
reversed and the case is remanded to the trial court for further proceedings 
consistent with this opinion.

Nathan L. Hecht
Justice  
Opinion delivered: May 29, 2003 
1. Tex. Const. art. VIII, § 1-e. 
2. Carrollton-Farmers Branch Indep. Sch. Dist. v. 
Edgewood Indep. Sch. Dist., 826 S.W.2d 489, 502 (Tex. 1992) 
[Edgewood III]. 
3. Edgewood Indep. Sch. Dist. v. Meno, 917 
S.W.2d 717, 738 (Tex. 1995) [Edgewood IV]. 
4. Id. 
5. 78 S.W.3d 529 (Tex. App.--Austin 2002). 
6. Edgewood Indep. Sch. Dist. v. Kirby, 777 S.W.2d 
391 (Tex. 1989) [Edgewood I]; Edgewood Indep. Sch. Dist. v. 
Kirby, 804 S.W.2d 491 (Tex. 1991) [Edgewood II]; 
Edgewood III, supra note 2; Edgewood IV, 
supra note 3. 
7. Tex. Const. art. VII, § 1. 
8. Mumme v. Marrs, 40 S.W.2d 31, 36 (Tex. 1931) 
("Since the Legislature has the mandatory duty to make suitable provision for 
the support and maintenance of an efficient system of public free schools, and 
has the power to pass any law relative thereto, not prohibited by the 
Constitution, it necessarily follows that it has a choice in the selection of 
methods by which the object of the organic law may be effectuated. The 
Legislature alone is to judge what means are necessary and appropriate for a 
purpose which the Constitution makes legitimate."). 
9. Edgewood II, 804 S.W.2d at 498. 
10. Edgewood I, 777 S.W.2d at 394; 
accord Edgewood IV, 917 S.W.2d at 736. 
11. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 
176-178 (1803) ("The powers of the legislature are defined and limited; and that 
those limits may not be mistaken or forgotten, the constitution is written. To 
what purpose are powers limited, and to what purpose is that limitation 
committed to writing, if these limits may, at any time, be passed by those 
intended to be restrained? . . . So if a law be in opposition to the 
constitution; if both the law and the constitution apply to a particular case, 
so that the court must either decide the case conformably to the law, 
disregarding the constitution; or conformably to the constitution, disregarding 
the law; the court must determine which of these conflicting rules governs the 
case. This is of the very essence of judicial duty."); Love v. Wilcox, 
28 S.W.2d 515, 520 (Tex. 1930) ("Since Marbury v. Madison, [5 U.S. (1 
Cranch) 137, 166-167 (1803)], the courts of last resort of the several states 
have almost universally followed the opinion of Chief Justice Marshall to the 
effect that it is clear that: 'Where a specific duty is assigned by law, and 
individual rights depend upon the performance of that duty, . . . the 
individual who considers himself injured, has a right to resort to the laws of 
his country for a remedy.'"). 
12. Edgewood IV, 917 S.W.2d at 726 ("This 
Court's role under our Constitution's separation of powers provision should be 
one of restraint. We do not dictate to the Legislature how to discharge its 
duty. As prominent as this Court's role has been in recent years on this 
important issue, it is subsidiary to the constitutionally conferred role of the 
Legislature. The people of Texas have themselves set the standard for their 
schools. Our responsibility is to decide whether that standard has been 
satisfied, not to judge the wisdom of the policy choices of the Legislature, or 
to impose a different policy of our own choosing."). 
13. Edgewood I, 777 S.W.2d at 392; 
Edgewood II, 804 S.W.2d at 495; Edgewood III, 826 
S.W.2d at 496; Texas Legislative Budget Board, Financing Public Education in 
Texas Kindergarten Through Grade 12 Legislative Primer at 25-26 (2d ed. 2000) 
[hereinafter LBB Primer]. 
14. Edgewood II, 804 S.W.2d at 495. 
15. Id. 
16. Edgewood I, 777 S.W.2d at 392. 
17. Edgewood II, 804 S.W.2d at 495. 
18. Act of June 2, 1969, 61st Leg., R.S., ch. 889, 
§ 1, 1969 Tex. Gen. Laws 2735, 2895-2896. 
19. See Act of May 17, 1945, 49th Leg., R.S., ch. 
304, § 1, 1945 Tex. Gen. Laws 488. 
20. Tex. Const. art. VII, § 5(a) ("The principal of 
all bonds and other funds, and the principal arising from the sale of lands 
hereinbefore set apart to said school fund, shall be the permanent school fund, 
and all the interest derivable therefrom and the taxes herein authorized and 
levied shall be the available school fund. The available school fund shall be 
applied annually to the support of the free public schools."). 
21. Edgewood II, 804 S.W.2d at 495 n.10. 
22. Edgewood I, 777 S.W.2d at 392. 
23. Id. 
24. Id. ("Of total education costs, the state 
provides about forty-two percent, school districts provide about fifty percent, 
and the remainder comes from various other sources including federal funds."); 
see LBB Primer, supra note 13, at 1 ("For the 2000-01 
biennium, state taxes are estimated to generate approximately 44 percent of the 
total funds and local school district property taxes 47.5 percent of the total. 
The federal government provides approximately 8.5 percent of the revenue, most 
of it earmarked for specific federal education programs."). 
25. Edgewood I, 777 S.W.2d at 392-393; LBB 
Primer, supra note 13, at 6 (stating, as of 2000: "There are 1,035 
school districts in the state. The tax base among these districts varies 
considerably. Kenedy County Wide ISD has more than $3 million in property wealth 
per enrolled student, while Boles ISD has less than $10,000 in property wealth 
per enrolled student."). 
26. Edgewood I, 777 S.W.2d at 392; 
see LBB Primer, supra note 13, at 21 (stating, as of 2000: 
"The number of districts subject to the recapture provisions range from 85 to 
100 in a given year. The associated recapture revenue is anticipated to total 
$949.8 million in the 2000-01 biennium."). 
27. Edgewood I, 777 S.W.2d at 392-393. 
28. Id. at 395 (citations omitted). 
29. Id. at 397. 
30. Id. at 398. 
31. Id. at 399; accord 
Edgewood II, 804 S.W.2d at 493. 
32. Edgewood I, 777 S.W.2d at 399. 
33. Id. at 397. 
34. Edgewood II, 804 S.W.2d at 495. 
35. Id. at 496. 
36. Id. at 495 n.11 ("The question of local 
enrichment continues to be controlled by this Court's opinion in 
Edgewood I, 777 S.W.2d at 397-98."). 
37. Id. at 500 (emphasis in original) (citation 
and footnotes omitted). 
38. Edgewood III, 826 S.W.2d at 492. 
39. Id. at 498. 
40. Id. 
41. Id. at 500. 
42. Id. (citation and footnote omitted). 
43. Id. at 502-503. 
44. Id. at 506; see Tex. Const. art. VII, 
§ 3(e) ("The Legislature shall be authorized to pass laws for the 
assessment and collection of taxes in all school districts and for the 
management and control of the public school or schools of such districts, 
whether such districts are composed of territory wholly within a county or in 
parts of two or more counties, and the Legislature may authorize an additional 
ad valorem tax to be levied and collected within all school districts for the 
further maintenance of public free schools, and for the erection and equipment 
of school buildings therein; provided that a majority of the qualified voters of 
the district voting at an election to be held for that purpose, shall approve 
the tax."). 
45. Edgewood II, 826 sw2d at 522-523. 
46. Tex. H.J. Res. 10, H.J. of Tex., 73rd Leg., R.S. 184 
(1993). 
47. Tex. S.J. Res. 7, 73rd Leg., R.S., 1993 Tex. Gen. Laws 
5560 (passed Senate 27-4 and House 102-43). 
48. Votes on Proposed Amendments to the Texas 
Constitution 1875 - May, 1993, at 27, reprinted in [4] 1993 Tex. 
Gen. Laws (amendment submitted May 1, 1993, defeated 755,417 to 1,293,224); 
Edgewood IV, 917 S.W.2d at 727. 
49. Act of May 28, 1993, 73rd Leg., R.S., ch. 347, 1993 
Tex. Gen. Laws 1479 [hereinafter Chapter 347]; see 
Edgewood IV, 917 S.W.2d at 727. 
50. Edgewood IV, 917 S.W.2d at 727. 
51. LBB Primer, supra note 13, at 2. 
52. Edgewood IV, 917 S.W.2d at 727 (quoting 
former Tex. Educ. Code § 16.002(b), Chapter 347, supra note 49, at 
1492, now Tex. Educ. Code § 42.002(b)(1)(A)); see LBB Primer, 
supra note 13, at 2. 
53. Chapter 347, supra note 49, at 1498 (codifying 
former Tex. Educ. Code § 16.101). 
54. Tex. Educ. Code § 42.101. 
55. LBB Primer, supra note 13, at 14-16. 
56. Edgewood IV, 917 S.W.2d at 727 (citing 
former Tex. Educ. Code § 16.254, Chapter 347, supra note 49, at 
1509-1511); see LBB Primer, supra note 13, at 2. 
57. See Edgewood IV, 917 S.W.2d at 
731 n.10 ("Based on the evidence at trial, the district court found that meeting 
accreditation standards, which is the legislatively defined level of efficiency 
that achieves a general diffusion of knowledge, requires about $3,500 per 
weighted student."). 
58. See LBB Primer, supra note 13, at 2. 
59. Edgewood IV, 917 S.W.2d at 728 (citing 
former Tex. Educ. Code § 16.302, Chapter 347, supra note 49, at 
1514). 
60. Tex. Educ. Code § 42.302; see LBB Primer, 
supra note 13, at 16-17. 
61. Edgewood IV, 917 S.W.2d at 728 (citing 
former Tex. Educ. Code § 16.303, Chapter 347, supra note 49, at 
1514); Tex. Educ. Code §§ 42.303, 45.003(d). 
62. See LBB Primer, supra note 13, at 2, 
19-20. 
63. Edgewood IV, 917 S.W.2d at 728 (citing 
former Tex. Educ. Code § 36.002, Chapter 347, supra note 49, at 
1480); Chapter 347, supra note 49, at 1479 (codifying former Tex. Educ. 
Code § 36.001); Tex. Educ. Code §§ 41.001-.002; LBB Primer, 
supra note 13, at 20-21. 
64. Edgewood IV, 917 S.W.2d at 728 (citing 
former Tex. Educ. Code § 36.002, Chapter 347, supra note 49, at 
1480). 
65. Tex. Educ. Code § 41.002; LBB Primer, 
supra note 13, at 21. 
66. Edgewood IV, 917 S.W.2d at 728 (citing 
former Tex. Educ. Code §§ 36.003-.004, Chapter 347, supra note 49, 
at 1480); Tex. Educ. Code §§ 41.003-.004 (requiring that a school district 
with excess wealth per student effectuate a reduction by one or more of the 
following: consolidation with another district, detachment of territory, 
purchase of average daily attendance credit, education of nonresident students, 
or tax base consolidation); LBB Primer, supra note 13, at 21. 
67. LBB Primer, supra note 13, at 21. 
68. Edgewood IV, 917 S.W.2d at 729-730 
(emphasis in original). 
69. Id. at 730; accord id. at 
731 ("The State's duty to provide districts with substantially equal access to 
revenue applies only to the provision of funding necessary for a 
general diffusion of knowledge."). 
70. Id. at 730. 
71. Id. at 730 n.8 (citation omitted). 
72. Id. at 732 (emphasis in original). 
73. Id. at 732 n.14; cf. Mumme v. 
Mars 40 S.W.2d 31, 36 (Tex. 1931) ("The word 'suitable,' used in connection 
with the word 'provision' in this section of the Constitution, is an elastic 
term, depending upon the necessities of changing times or conditions, and 
clearly leaves to the Legislature the right to determine what is suitable, and 
its determination will not be reviewed by the courts if the act has a real 
relation to the subject and object of the Constitution." (citation omitted)). 
74. Edgewood IV, 917 S.W.2d at 731 (footnote 
omitted). 
75. Id. at 738. 
76. Id. at 726. 
77. Id. 
78. See Act of May 27, 1995, 74th Leg., R.S., ch. 
260, 1995 Tex. Gen. Laws 2207; Act of June 1, 1997, 75th Leg., R.S., ch. 1071, 
1997 Tex. Gen. Laws 4087; Act of May 30, 1999, 76th Leg., R.S., ch. 396, 1999 
Tex. Gen. Laws 2471; Act of May 28, 2001, 77th Leg., R.S., ch. 1187, 2001 Tex. 
Gen. Laws 2667. 
79. Texas Legislative Budget Board, Financing Public 
Education in Texas Kindergarten Through Grade 12 Legislative Primer at 1 (3d ed. 
2001). 
80. Edgewood IV, 917 S.W.2d at 725. 
81. West Orange-Cove Consolidated I.S.D., Coppell I.S.D., 
La Porte I.S.D., and Port Neches-Groves I.S.D. 
82. See supra note 75 and accompanying text. 
83. Felipe Alanis, in his official capacity as the 
Commissioner of Education; Texas Education Agency; Carol Keeton Strayhorn, in 
her official capacity as Texas Comptroller of Public Accounts; and Texas State 
Board of Education. 
84. Edgewood I.S.D., Ysleta I.S.D., Laredo I.S.D., San 
Elizario I.S.D., Soccorro I.S.D., and South San Antonio I.S.D. 
85. Alvarado I.S.D., Anthony I.S.D., Aubrey I.S.D., Bangs 
I.S.D., Bells I.S.D., Community I.S.D., Cooper I.S.D., Covington I.S.D., Detroit 
I.S.D., Early I.S.D., Fannindel I.S.D., Hutto I.S.D., Karnes City I.S.D., 
Kaufman I.S.D., Kirbyville I.S.D., Krum I.S.D., La Joya I.S.D., Mercedes I.S.D., 
Meridian I.S.D., New Boston I.S.D., Nocona I.S.D., Olfen I.S.D., Orange Grove 
I.S.D., Poteet I.S.D., Robinson I.S.D., Rosebud-Lott I.S.D., Rusk I.S.D., 
Southside I.S.D., Tornillo I.S.D., Trenton I.S.D., Tulia I.S.D., Uvalde I.S.D., 
Venus I.S.D., and Weaterford I.S.D. 
86. The trial court stated in its order: "The 
changed-circumstances warning in Edgewood IV appears to be obiter 
dictum. Should the Supreme Court consider the present case, this court 
respectfully urges a reconsideration of this dictum. For the reasons cited, the 
court has concerns about the historical and analytical foundations of this 
dictum. Of course, dictum or not, the court today has faithfully followed the 
teachings of the Supreme Court, heeded the changed-circumstances warning, and 
applied the meaningful-discretion test." 
87. 78 S.W.3d 529 (Tex. App.--Austin 2002). 
88. Id. at 542 (emphasis in original). 
89. Id. 
90. Id. 
91. Id. at 539. 
92. Id. 
93. Id. at 540 (emphasis in original). 
94. Id. 
95. Id. at 542. 
96. 46 Tex. Sup. Ct. J. 426, 428 (Feb. 13, 2003). 
97. Edgewood III, 826 S.W.2d at 502. 
98. See Tex. Tax Code § 1.04(12). 
99. Edgewood III, 826 S.W.2d at 501. 
100. See Friesenhahn v. Ryan, 960 S.W.2d 
656, 658 (Tex. 1998). 
101. Edgewood III, 826 S.W.2d at 502-503. 
102. Id. at 502. 
103. Edgewood IV, 917 S.W.2d at 730 n.8. 
104. Id. at 736. 
105. Id. at 735. 
106. Tex. Educ. Code § 39.072. 
107. Id. §§ 39.091-.112. 
108. Id. § 39.131; see 
Edgewood IV, 917 S.W.2d at 729 ("Districts that chronically fail 
to maintain accreditation standards are subject to penalties, including 
dissolution of the offending school district and its annexation to another 
district."). 
109. Edgewood IV, 917 S.W.2d at 738. 
110. Id. 
111. See note 86 supra. 
112. See Seminole Tribe of Fla. v. 
Florida, 517 U.S. 44, 67 (1996) ("'Although technically dicta, 
. . . an important part of the Court's rationale for the result it 
reache[s] . . . is entitled to greater weight . . . .'" 
(quoting Sheet Metal Workers v. Equal Employment Opportunity Comm'n, 
478 U.S. 421, 490 (1986) (O'Connor, J., concurring))). 
113. Tex. Const. art. VII, § 1. 
114. Tex. Educ. Code § 4.001(a). 
115. Edgewood IV, 917 S.W.2d at 730 ("In 
Senate Bill 7, the Legislature equates the provision of a 'general diffusion of 
knowledge' with the provision of an accredited education. The accountability 
regime set forth in Chapter 35, we conclude, meets the Legislature's 
constitutional obligation to provide for a general diffusion of knowledge 
statewide."). 
116. Id. at 732 n.14. 
117. Id. at 730 n.8 ("This is not to say that the 
Legislature may define what constitutes a general diffusion of knowledge so low 
as to avoid its obligation to make suitable provision imposed by article VII, 
section 1. While the Legislature certainly has broad discretion to make the 
myriad policy decisions concerning education, that discretion is not without 
bounds."). 
118. 78 S.W.3d 529, 540 (Tex. App.--Austin 2002). 
119. Tex. Tax Code § 11.13(b)-(c). 
120. Id. § 11.13(d)-(f), (n). 
121. Texas Ass'n of Bus. v. Texas Air Control 
Bd., 852 S.W.2d 440, 445-446 (Tex. 1993). 
122. 925 S.W.2d 659, 661-662 (Tex. 1996) (citing 
Robbins v. Limestone County, 268 S.W. 915, 917 (1925) (holding that 
county and road districts can sue the state highway commission on the ground of 
the invalidity of statutes)). 
123. Id. at 662 (citations omitted). 
124. Tex. Educ. Code § 4.001(a). 
125. 40 S.W.2d 31, 36 (Tex. 1931) ("The legislative 
determination of the methods, restrictions, and regulations is final, except 
when so arbitrary as to be violative of the constitutional rights of the 
citizen.").